Michelle OLIVER et al., Plaintiffs,

v.

KALAMAZOO BOARD OF EDUCATION et al., Defendants.

No. K88–71 C.A.

United States District Court,
W. D. Michigan, S. D.

Sept. 30, 1980.

Thomas I. Atkins, New York City, Duane A. Elston, Detroit, Mich., for plaintiffs.

Ford, Kreikard, Staton, Allen & Decker, Kalamazoo, Mich., for defendant Kalamazoo Board of Education; Arthur Staton, Kalamazoo, Mich., of counsel.

Richard P. Gartner, Asst. Atty. Gen., Lansing, Mich., for State defendants.

Foster, Swift, Collins & Coey, Lansing, Mich., for intervenors MEA and KEA; Thomas A. Baird, Lansing, Mich., of counsel.

Antoinette B. Little, Kalamazoo, Mich., for amicus UAW TOPS Local No. 2150 (Administrators).

Dunnings & Canady, Lansing, Mich., for amicus Black Educators; Clinton Canady, III, Lansing, Mich., of counsel.

## OPINION

FOX, Senior District Judge.

In 1973, this court ruled that the Kalamazoo School District was unconstitutionally segregated, *Oliver v. Kalamazoo Board of Education*, 368 F.Supp. 143 (W.D.Mich. 1973), *aff'd sub nom. Oliver v. Michigan State Board of Education*, 508 F.2d 178 (6th Cir. 1974), *cert. den.* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The District is now experiencing a financial crisis which requires that it lay off approximately 128 teachers, and under its collective bargaining agreement the most recently hired teachers must be laid off first. A good proportion of these teachers are Blacks who were hired so that teachers from minority races might be more fairly represented in the schools. The lay offs would reduce their representation on the District's teaching staff, and this prompted the Board of Education (KBE) to file a motion requesting that this court, as part of its continuing jurisdiction over this case, declare null and void the lay off and recall provisions of the collective bargaining agreement to the extent that the KBE might recall enough Black teachers to maintain the same percentages that existed before the lay offs. The plaintiffs and an amicus group of Black teachers from the Kalamazoo School District also challenge the collective bargaining agreement, but they request that all laid off minority teachers be recalled. The intervenor-teachers' union and the state defendants have opposed these challenges, arguing that the lay offs must be governed by the labor contract.

## I. FACTS

### A.

The history of this school desegregation case is fully reported, *Oliver v. Kalamazoo Board of Education*, 368 F.Supp. 143 (W.D. Mich.1973); *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766 (W.D.Mich.), *aff'd* 448 F.2d 635 (6th Cir. 1971); however, it is necessary to repeat some of this so that the present motions can be placed in perspective.

Up until 1967, the Kalamazoo Board of Education had made little or no effort to seek and hire qualified Black staff. Thus, in the 1967–68 school year only 2% of the District's total staff was Black. 368 F.Supp. at 176–177. This slowly began to change in 1968 when the KBE voluntarily decided to desegregate its schools so that students would not be racially isolated. On November 6, 1968, the President of the Kalamazoo Board of Education appointed a Citizens' Committee on Integration (also known as the Racial Balance Committee) to recommend, among other things, general guidelines for the achievement of socio–economic and racial integration throughout the Kalamazoo public schools. 368 F.Supp. at 192.

The Committee's report was submitted on August 18, 1969.[1] It found serious racial isolation in the District's schools and determined that this racial isolation had a serious affect on the academic achievement of Black students. The Committee recommended that the schools be desegregated, and it suggested a plan to accomplish this. *Id.*, at 192. At the same time, it stressed the need for preparation and stated that it would not endorse any plan unless significant progress was made for its implementation, otherwise the desegregation plan would not end the frictions and tensions between Black and White students.

To insure that sufficient preparations were made, the Committee recommended that a three–step integration program be adopted. Report, pp. 6–7; 368 F.Supp. at 192. "Phase One" and "Phase Two" were to be devoted to preparatory matters, and it was recommended that these be begun in September 1969, with actual desegregation (Phase Three) commencing in September 1971. The first two phases called for curricula revision, in–service staff training, increased community communications, and the recruitment of more minorities so that Blacks would comprise 20% of all supervisors, administrators, teachers and counselors. Report, pp. 6–7. Phases One and Two were adopted by the Kalamazoo Board of Education on September 15, 1969, 368 F.Supp. at 192, with the Board's resolution establishing as a guideline that 20% of its staff be Black.

Work on the Phase III school desegregation plan began in 1970, and, with the assistance of a computer, the Committee's idea was given form. In January of 1971, the Board voted that desegregation of the two high schools would commence in September 1971. *Id.* This was followed on May 7, 1971 by a Board resolution that elementary and junior high desegregation also begin in September. *Id.*, at 194.

This latter decision caused an extreme reaction among the electorate, and in the school board election of June 1971 two proponents of desegregation were unseated. *Id.*, at 195–196. The newly constituted school board then passed a resolution on June 6, 1971 which nullified the former Board's efforts to desegregate the schools.

Shortly after this action was taken, suit was filed in this court which charged the Kalamazoo Board of Education with the creation and perpetuation of an unconstitutionally segregated school system. On August 20, 1971, this court entered a preliminary injunction which required that the KBE "fully and immediately carry out the implementation of the May 7 resolution." 346 F.Supp. at 782. The Board was also enjoined to carry out and implement "the various subsidiary aspects of the May 7 resolution." *Id.*

Hearings on a permanent injunction were held in 1973. This court's written opinion details how the Kalamazoo School District had become unconstitutionally segregated as a result of the acts of the Kalamazoo Board of Education, the Michigan State Board of Education, and the State Superintendent of Public Instruction. 368 F.Supp. 143 (W.D.Mich.1973), *aff'd* 508 F.2d 178 (6th Cir. 1974), *cert. den.*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). Among the KBE's constitutional violations were its rigid maintenance of attendance boundaries for predominantly Black schools; the use of optional attendance zones so White students could opt out of Black schools; the assignment of Black teachers to schools that were predominantly Black, and the failure to seek and obtain qualified Black staff prior to 1967. The impact of this last violation was described as follows:

> The Kalamazoo board further magnified the consequences of and trend toward increasing racial segregation in the schools by failing, at least before 1967, to seek and obtain qualified Black personnel. The record is clear that even at present, minority teachers are severely underrepresented on the Kalamazoo

---

1. The Committee's report was introduced into evidence during the trial in 1973 and at that time it was marked as plaintiffs' exhibit No. 38.

staff, comprising merely 6% to 7% of that staff in a system containing nearly 20% Black students. Before the administration's active recruitment effort of the late sixties, however, the number of Black staff was virtually negligible.

The adverse impact which racial isolation has upon Black and White children in terms of unrealistic self–images and detrimental attitudes is only intensified by a conspicuous absence of Black adults in positions of leadership and respect. This paucity of Black administrators and teachers was certainly a foreseeable result of board policies and was attributable to board policies. The damaging effect on students in Kalamazoo of the board's deliberate inaction should be and is a matter within the purview of the Constitution, if that vital document is to be accorded substance.

*Id.,* at 180.

Based on these findings, this court ordered that its preliminary injunction was to be made permanent. *Oliver v. Kalamazoo Board of Education,* K88–71 (November 2, 1973).

### B.

The Kalamazoo Board has apparently tried to adhere to its 1968 resolution that it attain a staff that is 20% Black. In 1969,

its minority staff increased to 5%, and in 1970–71 it increased to roughly 7.5%. 368 F.Supp. at 176–177. From 1971 through the present, the KBE has continued its efforts to increase the numbers of its minority employees. Some of its early efforts are detailed in this court's 1971 opinion concerning teacher layoffs. 346 F.Supp. 766, 782–785 (W.D.Mich.1971). This shows that while the District made great attempts to recruit Black staff, it met with only limited success for it had not only failed to achieve its 20% goal but had not even hired a sufficient number of minorities so that their percentage approximated the percentage of minority students in the system. *Id.*

How the District has fared since that time was a subject examined in a recent court–ordered study by Dr. Robert Green and Dr. Wilbur Cohen,[2] *see, Oliver v. Kalamazoo Board of Education,* K88–71 (November 30, 1979). Updated statistics from their report were introduced into evidence during the present hearings and these showed that from 1970–71 through 1978–79, 23.5% of all teachers hired were Black.[3] Despite these efforts, the District has made only modest gains in increasing the percentage of its Black staff, and during several years, including the past three, it has experienced a decline in this percentage.[4]

---

**2.** Report to the Honorable Noel P. Fox, Chief Judge of the United States District Court, Western District of Michigan, Southern Division: An Evaluation of the Results of the School Desegregation Order in *Oliver v. Kalamazoo Board of Education,* 368 F.Supp. 143 (W.D.Mich.1973), submitted by Dr. Robert L. Green and Dr. Wilbur J. Cohen (August 15, 1979). Hereinafter referred to as the Green–Cohen Report.

**3.**

NEW TEACHER HIRES:*
1970–71 through March 1979

| | Teachers Hired | Black Teachers Hired | % of New Teacher Hires Black |
|---|---|---|---|
| 1970–71 through 1971–72 | 109 | 10 | 9.2 |
| 1972–73 | 69 | 35 | 50.7 (1973 court order) |

| | Teachers Hired | Black Teachers Hired | % of New Teacher Hires Black |
|---|---|---|---|
| 1973–74 | 75 | 25 | 33.3 |
| 1974–75 | 138 | 34 | 24.6 |
| 1975–76 | 93 | 16 | 17.2 |
| 1976–77 | 54 | 10 | 18.5 |
| 1977–78 | 89 | 18 | 20.2 |
| 1978–79 (Mar.) | 67 | 16 | 23.9 |
| TOTALS | 694 | 164 | 23.6 |

\* Includes school psychologists and teachers returning from leaves of absence.

SOURCE: Progress Report, Attachment 5–6; Board Agenda clipboard for Teacher Hires.

**4.** According to the testimony of Superintendent of Schools Charles Townsend, this decline is

| Percentage of Black Teachers | | | |
|---|---|---|---|
| 1970–71 | 6.5 | 1975–76 | 10.6 |
| 1971–72 | 7.4 | 1976–77 | 10.7 |
| 1972–73 | 7.7 | 1977–78 | 11.6 |
| 1973–74 | 8.8 | 1978–79 | 11.5 |
| 1974–75 | 10.9 | 1979–80 | 11.1 |

During this same time period, the District's student enrollment has been undergoing changes. In 1969–70, 18,146 students were enrolled, but ten years later, in the just completed 1979–80 school year, the District had only 12,925 students.[5] At the same time, the percentage of Black students has increased from 16.2% in 1970 to 28.5% in 1979.[6] This increase was caused by a growing number of Black student enrollments, coupled with a decrease in the remainder of the student population.[7]

This declining enrollment has impacted on the District's finances since the State of Michigan determines basic state aid on a per–pupil basis. M.C.L.A. § 388.1621. Also affecting the District's finances have been yearly changes in the basic state aid formula which have resulted in the Kalamazoo School District receiving less state aid per child in every year since 1977–78.[8]

The basic state aid is listed in the District's operational budget, along with money received for special education, and that generated from property taxes, and miscellaneous sources.[9] This budget does not include any money which the District receives in federal and state categorical grants. These are funds which are earmarked for the operation of special state or federal programs,[10] and they cannot be used to pay for any other program. Thus, while this grant money could total as much as $2,000,000 for the present year it will not be available to offset the declining state aid, nor can it be used to pay for salaries or programs which are financed under the operational budget.[11] To offset its diminishing state aid and rapidly increasing operational costs, the KBE, beginning in 1974–75, has had to annually dip into a $2,000,000 surplus in order to balance its budget.[12] In 1978–79, the last of this surplus was used, but expenditures for that year still exceeded revenues by $231,884, and this had to be offset in the 1979–80 budget.[13] In 1979–80, still another deficit resulted, this one of approximately $288,000 which will have to be carried over into the 1980–81 budget.[14]

In drafting its budget for the coming school year of 1980–81, the KBE initially believed it could have a balanced budget if it gave attention to its programs and made personnel cuts to compensate for its declining enrollment.[15] Then in early 1980, the Governor's proposed state aid formula

partly attributable to a higher attrition rate among Black teachers. Many have left to take jobs with industry.

5. KBE Ex. No. 1. This same exhibit shows that the decline in enrollment is expected to continue for the next eight years, with the Kalamazoo Board's best estimate projecting that by 1988 the District will·have 11,500 students.

6. KBE Ex. No. 1.

7. From 1975 through 1979, Black student population in grades K–12 increased by 9.4%. During the same time period, the non–Black enrollment decreased by 16.8%. KBE Ex. No. 1.

8. The State of Michigan generally sets a minimum amount which is necessary for each student's education. From 1977–78 to 1979–80, this has varied from $1,364 to $1,615. The state aid formula then determines how much of this the local school district must pay. If the local district is unable to raise the necessary amount, then the State will pay the difference in basic state aid.

9. KBE Ex. No. 2.

10. This includes such programs as: Bilingual Education, Adult Basic Education, E.S.A.A., Elementary Secondary Education Act, Indian Education, and C.E.T.A. (Testimony of Mahlon Lantz, pp. 368–371.)

11. Testimony of Superintendent Charles Townsend, p. 454.

12. Testimony of Gerald Hedrick, p. 183.

13. Id., p. 184.

14. KBE Ex. No. 6.

15. Testimony of Superintendent Townsend, pp. 431–432.

was announced. Because of the State's crippled economic condition, this formula would give the KBE much less in state aid than had initially been expected.[16] The KBE's business manager estimated that total revenues would now be $29,815,292[17]—a figure that was approximately $3,100,000 less than projected expenses.[18] The Superintendent of Schools then made a recommendation to the Board of Education to ask the electorate for an additional two mills in property taxes. At the same time, the Board proposed a series of money–saving cuts; these included a proposal to lay off some teachers to adjust for declining enrollments, and the reduction of $60,000 from the $288,000 athletic budget.[19] The Board also adopted a contingency plan in case further budget reductions were necessary— these would be in such peripheral classes as physical education, health, media, art, and music.[20] The contingency plan called for a heavy reduction in staff, including some tenured teachers, and it was recommended that some buildings be closed.[21]

The decision to hold the millage vote was made on May 5, 1980, with the election to be held about one month later. One week after deciding to hold the election, a campaign director was appointed, but no professional consultant was retained or consulted.

The millage campaign centered on those segments of the community which had supported the schools in the past,[22] but the general electorate was not overlooked. Newspaper articles, pamphlets, and public meetings were used to inform the public as to why the schools needed additional money and the consequences that would befall them if the millage was defeated.[23]

Despite these efforts, the millage was still perceived by some as a "low key" campaign.[24] This was partly blamed on the fact that the election was only a month away and this prevented the Board from developing all the fanfare that usually attends such endeavors. Employee groups were also partly responsible because they did not mobilize their members in an effort to cultivate support for the millage;[25] instead, organized labor's contribution was limited to some last minute radio advertisements which the Kalamazoo Education Association purchased.[26]

---

16. *Id.*, p. 432.

17. KBE Ex. Nos. 3 and 6.

18. Testimony of Gerald Hedrick, pp. 188–189, 209–210. In determining the estimated expenses, Mr. Hedrick used the budget for 1979–80 and increased those costs by 10%, except in areas where it was known that major expenses would have to be incurred. One such major expense would be incurred when the District changed from oil to gas burning furnaces.

19. Testimony of Superintendent Townsend, p. 434.

20. *Id.*, p. 435.

21. *Id.*, pp. 435–436.

22. *Id.*, p. 499.

23. The District's educational effort was lacking in one important respect for it never told the electorate how much the millage increase would actually cost them. Because some of this tax could have been deducted or taken as a credit on state and federal income tax forms, most taxpayers would have recouped a share of what was paid, thus decreasing their total out–of–pocket payment. *See*, KEA Ex. No. 1. But the KBE should not take the sole blame for failing to have this information dispersed, just as it should not take the entire blame for the defeat of the millage. The KEA was in possession of this information concerning the actual cost of the millage since it had been prepared at its request. Had the KEA called on its members to actively work on the campaign, this information might have reached a substantial number of voters.

24. Testimony of Superintendent Townsend, p. 502.

25. *Id.*, pp. 502–503.

26. For reasons similar to those stated in note 23, *supra*, this court is troubled by the KEA's efforts to place the blame for the millage defeat solely on the KBE. The KEA stood to lose as much as the KBE if the millage failed because a substantial number of its members would be laid off. If it perceived the millage campaign as being "low key" and ineffective, it should have mobilized its members in an effort to save their jobs. It could have done this without a formal offer from the KBE to help with the campaign. The KEA can share some of the blame if the campaign was too low key to suit its tastes.

But whether the millage is characterized as "low key" or "intense," it still failed. The contingency plan came into effect and cost reductions of $2,545,155 are now planned,[27] with major savings coming from staff lay off and building closings.

The building closings are part of the KBE's effort to consolidate programs to save money and meet declining enrollments. Present plans call for the closing, or "mothballing," of seven elementary schools, which will result in savings of $76,000 for the first year and $147,000 and more in years thereafter.[28] The students from these schools would be transferred to two junior high buildings. Changes would be made at the junior high level through the transfer of all ninth grades into the high school buildings.[29]

The other major saving will come from staff reductions, including the lay off of 128 teachers, 76 of whom are tenured and 52 of whom are probationary.[30] When this total is combined with the natural attrition the District expects it will reduce the KBE's number of teachers from 862.4 in 1979–80 to 698.8 for 1980–81.[31] It is expected that 21 administrators will then be transferred to the teaching ranks and if this is done the District's staff will increase to 710.8.[32] This number will then be increased to 735.8 when special education and bilingual teachers are recalled, as they must be under the law.[33]

The collective bargaining agreement between the Kalamazoo Board of Education and the Kalamazoo Education Association sets forth the procedure for the teacher lay offs. Article XXIII of this agreement provides, with some exceptions, that lay offs are to be based on seniority. First, probationary teachers are to be laid off to the greatest extent possible, and then after the lay off of all probationaries, tenured teachers with the least amount of continuous seniority shall be laid off.[34]

Strict application of this rule necessitated the lay off of all probationaries and of those tenured teachers who were hired on or after

---

**27.** The original 1980–81 projected budget listed expenditures of $31,747,939. KBE Ex. No. 5. The adjusted budget is now $29,192,784. *Id.*

**28.** KBE Ex. No. 4. The reduced first year savings are based on the fact that in that year there will be moving and remodeling costs of $71,000. The $147,000 in savings which the District will experience beginning in 1981–82 can be broken down into $119,000 in building operational savings and $28,000 in reduced secretarial expenses.

**29.** These building closings and student reassignments are going to necessitate major changes in the school attendance plan which this court approved in 1973. At present the parties are working on a stipulation which will permit these changes to take effect, and which, at the same time will preserve racial balance among the students.

**30.** KBE Ex. No. 5 lists the reductions which the KBE proposes to make from its original projected 1980–81 budget. Of the $2,626,163 in "Staff and Related Cuts," *see*, KBE Ex. No. 5, p. 4, $2,362,051 is made up of salaries. This figure was determined by adding together all the proposed cuts in salaries listed in the exhibit:

| | |
|---|---|
| Elementary | $ 608,357 |
| Secondary | 1,225,358 |
| Spec. Ed. | 328,268 |
| Adult Ed. | 115,260 |
| Administrative | 9,400 |
| Health Services | 50,408 |
| Pupil Transportation | 25,000 |
| | $2,362,051 |

If all the salaries of the laid off teachers are totaled from KBE Exhibits Nos. 8 and 9, one learns that the savings resulting from the lay off of the tenured teachers will be $1,158,370, and for probationaries (including special education), $567,737. The lay off of two non–tenured probationary employees and five student services probationary teachers will also save $79,880. None of these savings in salaries reflect a $292,000 increase in unemployment insurance and savings of $252,014 in fringe benefits, both of which resulted from the lay offs. KBE Ex. No. 5, p. 3.

**31.** KBE Ex. No. 10.

**32.** *Id.* The administrators have challenged their transfer to the teaching ranks, claiming that it violated state law and their contract with the District. This issue is now before this court, and a decision will be reached shortly.

**33.** *Id.*

**34.** KBE Ex. No. 7.

August 30, 1973.[35] Because a substantial number of minority teachers had been hired since that date, the layoffs will decrease the percentage of minority teachers from 12.6% in 1979–80 to 9.8% in 1980–81, with the percentage of Black teachers falling from 11.1% to 8.9%.[36]

The Kalamazoo Board of Education was aware that the lay offs would reduce the percentage of its minority staff,[37] but the Board believed that if it did not lay off according to the contract it could face numerous individual lawsuits from teachers.[38] It therefore chose to make the lay offs and at the same meeting gave its attorney the authority to file the present motion which seeks to have the lay off provisions of the collective bargaining agreement declared null and void so that it might recall enough Black teachers to maintain its pre–lay off percentages of minority and non–minority teachers. It states that only 15 teachers need to be recalled to reach this level.[39]

According to school officials, the District will not be able to recall all the laid off teachers this year. At best, it estimates that its budget cuts will leave it with only $97,852 which can be used to recall teachers who work in areas other than special education or bilingual education.[40] According to Superintendent Townsend, the Kalamazoo Board of Education will not hold another millage election this year in an effort to pass a two mill levy.

## II. POSITIONS OF THE PARTIES

The lay offs have caused a three–way split in the type of relief being sought. The plaintiffs' position, although not formally set forth in any written pleading, is that all Black teachers, both tenured and probationary, be recalled from lay off and that no other Black teacher be laid off until the District's teaching staff becomes 20% Black. It views this 20% goal as a court–ordered desegregation remedy and would deem any lay offs as a step away from this goal, and a violation of this court's remedial order. It asks this court to nullify the lay off and recall provisions of the contract. This relief is identical to that sought by the amicus Black educators, who represent the Black teachers of the District.

The position of the Kalamazoo Board of Education has been heretofore stated. It would limit the relief to the recall of as many minority teachers as is necessary to maintain the same racial percentages as existed on the teaching staff in 1979–80. In asking for this relief, the District's Superintendent and the KBE's former president both emphasized that the KBE was committed to achieving the goal of 20% minority staff, but they emphasized that this goal had to be achieved in a meaningful way. Henry Goodman, former Board President, stated that lay offs should not be permitted to reduce the gains the KBE had made, but lay offs should also not be used to go beyond that in order to achieve court–ordered goals. Dr. Townsend stated that the burden of the lay offs should be shared, thus more experienced whites should be laid off in order to maintain racial balance, but to go beyond that would not be fair because it would result in the sacrifice of experienced teachers who are dedicated to teaching in a desegregated environment. He stated that the 20% goal would only be meaningful if one could "look back and not see the mangled humanity of both black and white who were in some way sacrificed to attain it."

35. KBE Ex. Nos. 8 and 9.

36. KBE Ex. No. 10, p. 1. Testimony of Mahlon Lantz, pp. 335–336. Mr. Lantz indicated that percentages could vary slightly depending on the race of the administrators who become teachers and the race of the special education and bilingual teachers who are recalled. *See,* pp. 335–340. Of the 76 tenured teachers now scheduled for lay off, 21 are Black, while the 52 probationaries contain 13 Black, 3 Hispanic, and one Native American.

37. Testimony of Henry Goodman; testimony of Superintendent Charles Townsend, pp. 446–448, 520–521; testimony of Mahlon Lantz, pp. 335–336.

38. *Id.*

39. Testimony of Mahlon Lantz, p. 347.

40. KBE Ex. No. 6.

The Kalamazoo Education Association, which is the teachers' collective bargaining agent, and the State defendants have taken the position that the collective bargaining agreement must be upheld and that the seniority based lay offs must stand. This position is premised on several arguments: first, that this court never assumed jurisdiction over the hiring, lay off and recall aspects of this desegregation case and now cannot impose a remedy dealing with these areas; second, that even if it did assume jurisdiction, the violation has been remedied and jurisdiction must cease; third, that the collective bargaining agreement was negotiated in good faith and should be upheld.

## III. THE MOTIONS

### A.

Both the State defendants and the KEA claim that this court does not have jurisdiction to order the relief requested because its 1971 preliminary injunction and 1973 permanent injunction not only ordered no relief in the area of staff desegregation but specifically rejected such relief. It is their position that the present motion is an attempt to relitigate this issue and that it is barred by res judicata.

The facts in support of their claim are:

(1) This court's preliminary injunction of August 20, 1971, delivered from the bench, specifically denied relief which would have reassigned the District's staff so that certain buildings would not have a racially identifiable faculty. This court stated:

> And likewise the request for directing faculty and staff assignment is denied because there is nothing before the Court upon which it could legitimately act in this respect.

(2) On February 7, 1972, plaintiffs filed their Second Amended Complaint wherein they sought the following relief:

> Enter a decree enjoining Defendants ... from employing additional white teachers ... until the ratio, "previously set by the Board of Education" of Black Teachers ... approximately equals the black student population within the Kalamazoo Public School District; and enter an order requiring Defendant Kalamazoo Board of Education to recruit and hire black teachers, counselors and administrators as prayed for above.

After a trial on the merits, this court entered an order and judgment which made its preliminary injunction permanent, and denied all other claims for relief asserted by plaintiffs in their complaint. This order was affirmed by the Sixth Circuit. *Oliver v. Michigan State Board of Education*, 508 F.2d 178 (6th Cir. 1974).

(3) By motion dated December 20, 1974, the KBE and State defendants filed a Motion to Tax Costs in the Court of Appeals. At issue was a joint appendix that had been submitted to the court of appeals as part of the appeal from this court's 1973 decision. It was alleged that the plaintiffs had included unnecessary materials in this appendix and that the KBE and State defendants should not have to pay for this. They claimed that one unnecessary part of the appendix was a portion of a transcript relating to faculty desegregation. The court of appeals ruled for defendants, stating:

> Almost two volumes of the appendix, consisting of about 497 pages, was devoted to a transcript of a hearing on desegregation of the faculty. The District Court in its final order granting a permanent injunction, did not include faculty desegregation, and in fact, it denied all other claims asserted by plaintiffs, one of which included faculty desegregation. Plaintiffs did not appeal from the Order. Appellants did not include faculty desegregation in their statement of issues and there was no basis for appellees to designate the complete transcript on that subject. None of the briefs of the parties dealt with faculty desegregation.

Order on Motion to Tax Costs, pp. 5–6 (6th Cir. March 12, 1975).

From the way these facts have been presented one might conclude that this court's 1973 order and injunction did not reach the area of increased minority hiring. However, this position is erroneous, as can be seen from a more detailed examination of the facts.

As was already discussed above, the desegregation of the Kalamazoo public schools was initially a voluntary effort which required a substantial amount of preparation so that it could succeed. A vital part of this preparation required that the District achieve a 20% minority staff.

The need for "careful and methodical preparation" was not lost on this court, 368 F.Supp. at 192; 346 F.Supp. at 773. It was aware that on May 7, 1971, when the Kalamazoo Board of Education adopted its plan of student desegregation, much of the preparatory work was still being undertaken—particularly in the area of faculty hiring where the Black staff was still substantially below the goal of 20%. 368 F.Supp. at 180. This fact was of some concern to this court for it did not want to order student reassignment if the proper groundwork was not in place. If this were not done, the good which could flow from student reassignment might never materialize, and the plan could fall apart—very much like a house that was build on an unfinished foundation. Thus, to insure that the plan would not fail, this court's preliminary injunction did more than just order the implementation of the May 7 student assignment plan; it also ordered the KBE to "implement the various subsidiary aspects of the May 7 resolution." 346 F.Supp. at 788. These "subsidiary aspects" encompassed all the preparatory work that was necessary for the student assignment plan to function effectively, and this included the hiring of more minority teachers so that the 20% goal could be achieved.

This decision that more minorities be hired is not in conflict with the court's ruling from the bench that it would not require the reassignment of present teachers in order to achieve racial balance among the schools. There is a difference between the hiring of new teachers and the reassignment of those already in the system. The latter type of relief was specifically denied, but the former was not.

In determining if the preliminary injunction should be made permanent, this court specifically found that the Kalamazoo Board of Education's hiring practices had contributed to the creation and perpetuation of segregated schools in the District. 368 F.Supp. at 176. Its failure to hire more Black personnel compounded its acts of unconstitutional segregation because it intensified the "unrealistic self–images and detrimental attitudes" which the racial isolation had inflicted on Black and White students. *Id.*, at 180. This paucity of teachers and administrators had to be remedied in order to eradicate all vestiges of state imposed segregation. To accomplish this, it was unnecessary for this court to enter a separate order specifically calling for increased minority hiring because the preliminary injunction had already ordered the Kalamazoo Board to continue its efforts to achieve a 20% Black staff. All this court had to do was make the preliminary injunction permanent and this 20% goal became part of this court's desegregation remedy. Thus, this court's permanent injunction did not deny relief relative to minority hiring as defendants believe; it actually ordered that the KBE achieve a staff that was 20% Black.

█ Through its permanent injunction, this court assumed jurisdiction over all preparatory phases of desegregation, including the Kalamazoo Board's actions in the area of hiring and dismissal of employees since this would affect its ability to achieve the court–ordered goal of a 20% Black staff. This would insure that the Board would lay the strong foundation necessary for the success of the pupil desegregation plan. This gives the court the right to maintain continuing supervision over these aspects of the case, *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and permits it to review any challenges

which allege that the contractual provisions governing the lay off and recall of teachers violate the remedial order to increase the percentage of minority staff.

But even if this court's injunctions had not dealt with minority hiring, there would still be jurisdiction over the present motions. This is because the lay offs will allegedly have an impact on the District's Black students because they will be deprived of Black role models. This, it is claimed, will perpetuate the negative impact suffered by the students as a result of the District's earlier constitutional violations, particularly its failure to hire minorities. Further, the lay offs will allegedly affect the way in which Black students perceive their schools for it will reinforce old sterotypes that Blacks are always the first to be fired. All of this, it is claimed, will impede the District's efforts to implement the court–ordered remedy and achieve unitary status.

█ Allegations such as these are alone sufficient to prompt this court into action, with its authority to act premised on its continuing jurisdiction to uphold its order and insure that it is carried out. No court can sit idly by while a school board undertakes acts which will allegedly delay or impede the operation of its desegregation order. This is true even if the actions are not motivated by any discriminatory intent, or involve areas which were not the subject of the original desegregation order. All a court needs to be concerned with is the impact which the action has;[41] and where, as here, it is alleged that the Board's decision to lay off teachers will interfere with, or delay, the desegregation process, then such action must be open to court review and subject to possible modification if this is found appropriate. How else can a court fulfill the mandate that a state–imposed dual system of education be dismantled at the earliest possible date? *Green v. County School Board, supra* at 439, 88 S.Ct. at 1694.

### B.

A second argument raised by the Kalamazoo Education Association is that even if this court's permanent injunction required the KBE to hire more minorities, a sufficient percentage has been hired so that the constitutional violation has been remedied. Therefore, whatever jurisdiction this court may have had over the hiring and lay off of employees has been terminated and can no longer be exercised.

It supports its position with statistics taken from the report which was prepared as part of the court–ordered study of the Kalamazoo School District. The report's authors, Dr. Wilbur Cohen and Dr. Robert Green, examined the Kalamazoo Board's efforts to recruit minority teachers and compared the results with various labor indicators. This established that in 1977–78 the District's percentage of Black teachers (11.6%) met, or exceeded, most of the chosen standards, such as: current Black applicant rate–11.7%; percent Black population of Kalamazoo County–5.5%; percent of education degrees conferred on Blacks by Michigan colleges and universities for 1975–76–10.0%; percent Black population in Michigan–9.7%; and percent Black in the United States–11.0%.[42] The only statistics the District did not surpass were its own goal of 20%, and the percent of Black job–seeking educators in the Standard Metropolitan Statistical Area which was 14.9%. This led Drs. Green and Cohen to conclude that "Blacks were found to be equitably represented on the teaching staff at the elementary and secondary level, according to most labor market indicators, but not according to the District's goal."[43]

---

**41.** *Washington v. Davis*, 426 U.S. 229, 243, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) makes clear that once an intent to discriminate has been found and a remedy has been ordered, then future actions of the school district can be judged by the impact which they have on the district's ability to implement the remedy. If they will interfere with, or delay, the achievement of unitary status, then such actions cannot be countenanced.

**42.** Green–Cohen Report, p. 54.

**43.** *Id.*, at 94.

A problem which this court has with the KEA's argument is its premise that once a sufficient number of minorities has been hired then this court's jurisdiction over hiring and lay offs is at an end. This, however, is shortsighted, for it assumes that this court's jurisdiction is only based on its order that the KBE include more minorities on its staff. It overlooks the fact, as stated above, that this court's ability to act is also based on the impact which the lay offs will have on the District's efforts to complete the other parts of the desegregation process.

Where jurisdiction is premised on this latter ground, then it makes little difference if the school district has hired its requisite share of minority employees. If the school district's other violations remain unremedied, and a lay off will change the percentage of the minority staff and have a detrimental impact on the District's ability to complete the remedial process and carry out the court's desegregation order, then the court must be able to review the lay offs and their impact.

■ This means that a district court's jurisdiction over a certain aspect of desegregation is not necessarily terminated when that aspect is set right. So long as subsequent changes in that area could impact on the school district's efforts to remediate its other violations, then the district court must be able to maintain jurisdiction so it can insure that its desegregation order is not being frustrated. The court's jurisdiction can only be deemed at an end when a change in one area will have no adverse impact on the school district's efforts to remediate violations in other areas.[44]

■ In the instant case, the Kalamazoo Board of Education is still trying to eradicate all the effects of its constitutional violations and attain unitary status. *Oliver v. Kalamazoo Board of Education*, K88–71 (November 30, 1979). The lay offs, it is alleged, could affect the District's efforts. This means that this court's jurisdiction

over hiring and lay offs is not terminated; it has jurisdiction to review the lay offs and the power to enter a remedial order concerning them if it is determined that they will have a harmful impact on the District and hinder it in attaining unitary status.

While the alleged impact of the lay offs is alone enough to sustain the exercise of continuing jurisdiction, this court believes it should address the KEA's claim that its jurisdiction must be terminated because the percentage of minorities on the District's staff equals, or exceeds, the percentages established by various labor indicators.

■ The initial problem with the KEA's argument, and its use of statistics, is that it is, in essence, contending that something less than 20% minority staff will suffice to remedy the constitutional violations which this court found in the area of staff hiring. This, however, is not the time for such an argument. If the KEA, or any other party, believed that labor statistics called for a lower percentage than 20%, it should have appealed the decision at the time it was made in 1973, and not sought to relitigate it seven years later. This decision is now binding on the parties and reconsideration is barred by res judicata. Yet, even if this court were to reach the issues raised by the KEA, it would uphold its 20% goal as necessary for the remediation of the KBE's violations.

The KEA's use of labor statistics to determine if a hiring violation has been remedied is similar to how statistics have been used in cases arising under Title VII. In these cases, statistics concerning the racial composition of an employer's work force have been compared to the racial composition of the relevant labor market, and a gross disparity between the two has established a prima facie case of employment discrimination. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States*, 431

---

44. Since it cannot be predicted when a change will affect a school district's efforts to complete the desegregation process, the court's ability to exercise continuing jurisdiction will, in all likelihood, last until all violations have been remedied and unitary status has been achieved.

U.S. 324, 339–340 and n. 20, 97 S.Ct. 1843, 1856 and n. 20, 52 L.Ed.2d 396 (1977). Remedies in these cases have generally required that the employer cease his discrimination and that he make concerted efforts to bring the racial composition of his work force in line with that of the labor market. *See, Detroit Police Officers Association v. Young*, 608 F.2d 671 (6th Cir. 1979). In these cases, it is generally understood that the discrimination will be deemed remedied once this hiring goal is achieved.

▮ There is nothing talismanic, however, in having an employer achieve a level in its work force that is representative of the racial and ethnic composition of the labor market. This alone does not mean that discrimination, and its effects, have been eliminated. The scope of any remedy, whether it be under Title VII or the Fourteenth Amendment must be determined by the nature and scope of the violation, and must be designed " 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' " *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977), *quoting Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

▮ It just so happens that in a Title VII case, involving racially discriminatory hiring practices, the victims are invariably limited to being members of the relevant labor market who were excluded from employment because of their race. Thus to restore these individuals to the position they would have enjoyed, but for the discrimination, requires a remedy that will draw more of these victims out of the labor pool and into the employer's work force, and it is reasonable to continue until that group is fairly represented on the work force.

▮ But school desegregation suits differ from Title VII cases because here a school district's unconstitutional hiring practices can have an impact which affects not only those in the labor market who

were excluded from work, but also others, most notably students. In such a case, a court must use care in fashioning a remedy because what might be sufficient to remedy one group's injuries may do nothing towards making the other group whole. This is because both may have been harmed in different ways by the district's failure to hire minorities. This means that a court may not be able to remedy the injuries suffered by the students and the excluded workers merely by ordering a school district to have its work force meet or exceed certain labor market standards. This might be sufficient to remedy the impact suffered by those in the labor market who were discriminated against, but it may not be enough to remedy the injuries suffered by the students.

In the instant case, the Kalamazoo Board of Education, itself, determined that a 20% Black staff was necessary in order to remedy the injuries which its actions had inflicted on the students of the District. During the trial in 1973, no one challenged this figure and it was adopted by the court, primarily because it had been formulated by those who were thoroughly familiar with the school district.

That this court's decision was correct was made clear by Dr. Robert Green, a well–respected authority on matters concerning school desegregation and a co–author of the court–ordered study of the Kalamazoo School District. His uncontradicted testimony was that in a district like Kalamazoo, which has been found to have engaged in racial discrimination against students, unitary status cannot be achieved until a "critical mass" of Black teachers and administrators has been hired.[45]

In determining what number, or percentage, of Black teachers will form a critical mass for Kalamazoo, Dr. Green did not focus on any of the labor market indicators. Instead, his major consideration was to achieve a number which would insure that Black students had enough role models.[46] He stated that in a school system like Kala-

---

**45.** Testimony of Dr. Robert Green, pp. 39, 41.

**46.** *Id.*, pp. 38–42.

748

mazoo, which has a multi-racial student body, the need for role models is important because they can encourage minority students to higher aspirations and at the same time work to dispel myths and stereotypes about their race.

As a general rule, Dr. Green stated that a school district's faculty ought to begin to approximate the percentage of minority students in the district; however, other factors must be considered, so the critical mass is not always equal to student ratios.[47] In Kalamazoo, he said he would trust the District's judgment in setting 20% as the critical mass.[48]

■ Since a "critical mass" of 20% is required for the District to achieve unitary status, the question of this court's continuing jurisdiction is not very difficult. The District has not yet achieved this goal, and accordingly, this court has jurisdiction over matters concerning hiring and lay offs until it does.

C.

The KEA's next argument is that there are funds available, or which could be made available, to solve the District's financial crisis and permit the recall of all laid off teachers. This argument is similar to one which was presented to this court in 1971 when lay offs last threatened the jobs of minority teachers. In that case, the Kalamazoo Board had additional monies in its library fund and it was ordered to use these to help pay the salaries of the laid off teachers. *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766, 782–787 (W.D. Mich.1971). As a result of this ruling, this court never had to address the issue of whether the recall and lay off provisions of the teachers' collective bargaining agreement should be nullified in order to protect the positions of minority teachers.

This court has recognized that when a school board is under an order to desegregate, its budget is subject to court review to insure that its allocation of funds does not have a detrimental impact on its ability to remedy its constitutional violations.

The board of education of any school district has the power as a duly constituted legislative body to formulate policy in the management of the school system charged to its responsibility. Judgments as to fiscal policy are authorized under this power. However, these judgments are subject to the review of the courts when they are found to infringe constitutional rights. Whenever a school board is faced with two alternative courses of action, one of which will necessarily impinge upon the provision of Fourteenth Amendment equal educational opportunities to *all* children within the school district and the other of which will not, the board is not free to pursue the former course. Any attempt by it to do so can and should be stricken by the courts. *Oliver v. Kalamazoo Board of Education*, 346 F.Supp. 766, 786 (W.D.Mich.1971).

■ This does not mean that a court can just strike out at various parts of a budget, shifting funds from one program to another; this is best left to the board of education, whose job it is to decide school policy. Before a court can act, it must be persuaded that either the challenged allocation of funds is not necessary for the remediation of the district's constitutional violations, while the proposed use of the funds will remediate these violations, or alternatively, that the funds, as allocated, will only have a minimal effect on the district's efforts to desegregate, while the proposed use will have a substantially greater and longer lasting effect.[49] The party challenging the school district's budget has the burden of proof on this point.[50]

47. *Id.*, pp. 113–114.

48. *Id.*, p. 113.

49. This was the procedure which this court followed in 1971 when it decided that library

funds had to be transferred into the school operating budget.

50. It would be unreasonable to place this burden on the school district because it would have to come into court and justify every line of its budget, or risk having its funds reallocat-

The evidence at the hearing indicated that since 1971 the KBE has closed several school buildings as part of a District reorganization. Peter Pan and Roosevelt have already been sold, and Hillcrest is being leased to Western Michigan University.[51] Lindberg, Pleasant Park and Fairview are up for sale; Lindberg has an outstanding offer of $80,000, while Pleasant Park and Fairview have offers of approximately $50,000–$60,000 each, with the bid on Pleasant Park having been accepted.[52] The administration building could also be sold, as could the seven elementary buildings which will close this year; the administration building was appraised five years ago at $700,000, but the newly closed elementary buildings have never been appraised.[53]

The KEA claims that the KBE should be ordered to sell these buildings and use the proceeds to recall teachers and provide a complete academic program. The KBE's position is that even if it could sell these buildings most of the proceeds would have to be used to maintain and repair the remaining schools, particularly their roofs.

The KBE's plight was made clear by Superintendent Charles Townsend who stated that for the past three years the Board of Education has been shifting money away from maintenance and building operations and has used it to maintain its K–12 programs.[54] Now there are buildings which have not been maintained on a regular basis. Roofs are particularly in need of repair; one school had its roof collapse and others allow water to leak into classrooms.[55] In his opinion, the money from the sale of buildings would allow emergency repairs so that normal classroom operation could continue.

In certain circumstances, building maintenance and improvement might have to be temporarily forsaken so that the constitutionally required remedy of desegregation can be accomplished. However, where the condition of buildings is such that the health and safety of children is threatened, or the learning environment is substantially impaired, then this could have a serious effect on the district's efforts to desegregate. In such a case, a court should make a reasonable effort to accommodate the district's need to repair.

In the instant case, the testimony clearly indicated that buildings are in great disrepair and that failing roofs could threaten student health, and even their lives, should another collapse. If such tragedy occurred, then this court's desegregation order would be dealt a grievous setback. Therefore, the KBE will be permitted to use the money from the sale of buildings to effect the needed repairs.

The KEA states that the roof repairs might be done more cheaply if other materials were used, thus leaving more money for the recall of teachers. This is partly an engineering issue, an area not outside the province of this court when it is presented with sufficient and competent evidence. But here, there was a paucity of testimony about the roofs and the relative merits of each type of construction material.[56] Such meager testimony, especially coming from someone unskilled with roof work or school repair, is not persuasive to this court. The KBE will be permitted to conduct the repairs according to its own plan, even if this may be more costly than the plan proposed by the KEA.

ed. This court believes that it is better to operate under the assumption that those professionals, charged with the education of our children, are expending school funds in the most appropriate fashion. Courts should step in only when these educators are proven to be wrong.

**51.** Testimony of Superintendent Charles Townsend, pp. 467–471, 507.

**52.** *Id.*

**53.** *Id.*, pp. 508–510; testimony of Gerald Hedrick, pp. 266–267.

**54.** Testimony of Superintendent Townsend, pp. 471–472.

**55.** *Id.*

**56.** The KEA's proof on this point was limited to the testimony of Robert Sikkenga, the KEA's local representative.

The KEA also questions two other potential sources of funds, claiming that teachers can be recalled if money is transferred from the public library budget and if reductions are made in the amount of money allocated for competitive athletics. In Kalamazoo, the public library is under the control of the Kalamazoo Board of Education and in the past it has been possible to transfer money from the library budget into the operating budget for the schools. In 1971, this court ordered such a transfer, and last year the Board of Education voluntarily transferred approximately $81,000 to the schools.[57] This year a transfer of $246,000–$247,000 could be made, but it has not been requested.[58] Competitive athletics is presently allocated about $228,000; this reflects a reduction of $60,000 that was made from the original allotment of $288,000.[59]

■ In the instant case, the KEA has failed to meet its burden of proof with respect to the funds in the competitive athletics budget. All it has shown is that there is approximately $220,000 remaining to be spent; it has not established that this program is unnecessary for the remediation of the District's violations, or that it will have only a minimal impact on its remedial efforts.

■ What the KEA supposedly wishes is that this court assume that competitive sports are less beneficial than the addition of classroom teachers, and hence the money allocated for sports should be used to recall laid off teachers. This, however, is an assumption which this court will not make because each school district is different and the respective benefits which each receives from sports, or any other budget expenditure, could vary from district to district. This means that any questions concerning the budgeting of school funds, and their impact on the remediation of Fourteenth Amendment violations, are best treated as questions of fact, with the party who is challenging any expenditure being under an obligation to present evidence in support of his claim that the money would be better spent elsewhere.

■ As for the money in the library fund, this court is convinced that the KEA has met its burden of proof. The evidence disclosed that approximately $246,000 could be transferred into the school district's operational budget. The availability of this money indicates that it is of marginal importance to the libraries and is designed to be used where it can accomplish the most good. Right now, the KBE's need to remedy its constitutional violations is of great importance. It is therefore ordered that this $246,000–$247,000 be transferred from the library budget into the operational budget and used for the recall of teachers.

■ Finally, it is alleged by several parties that the approximately $2,000,000 which the KBE expects to receive in state and federal categorical grants can be used to recall teachers. This was an area that was covered by several witnesses, including the Superintendent of Schools, and their testimony clearly established that this money can only be used to finance the special programs for which it is earmarked.[60] It cannot be used to pay for the recall of teachers whose salaries are funded under the operational budget.

### D.

The money which is to be transferred from the library budget will not be enough to recall all the District's laid off teachers; hence this court cannot avoid the issue of who should be laid off, as it could in 1971 when there was enough money to recall everyone. The question before the court is best stated as follows:

Where a court's desegregation order requires that a school district hire more Black teachers in order to remedy injuries which its segregative acts inflicted on its students, can the district conduct se-

57. Testimony of Gerald Hedrick, p. 275.

58. *Id.*

59. Testimony of Superintendent Townsend, p. 434.

60. *Id.*, pp. 454–455.

niority based teacher lay offs, as required by its collective bargaining agreement, where this will reduce the percentage of Black teachers in the District and either delay it from achieving the hiring goal established by the court, or impinge on its ability to remedy its other constitutional violations?

The Kalamazoo Education Association argues that the labor contract, including the lay off and recall provisions, was negotiated in good faith. It, in effect, claims that so long as the questioned provisions were freely negotiated and were in no way motivated by a discriminatory intent, then a court must uphold the contract.[61]

This argument overlooks the fact that the plaintiffs in this case are the District's students and not its teachers. *Morgan v. Kerrigan*, 530 F.2d 431 (1st Cir. 1976). It is these students who were victimized by the KBE's constitutional violations, including its failure to hire minority teachers, and this court's remedial order was designed to make them whole. This remedy was mandated by the Constitution, and it is absurd to believe that its implementation could be thwarted by a contract, particularly one to which the plaintiffs, or their representatives, were not a party. Yet this is exactly what the KEA would have this court believe, for it would use its contract to delay or impede the remedy which was intended for the students.

It also makes little difference that the parties had no discriminatory intent when they entered into the contract. As has been noted above, for this court to act, all that needs to be shown is that the operation of the contract either impinges on the District's efforts to comply with the court's order to achieve a 20% Black staff, or that it affects its ability to remedy its other constitutional violations and achieve unitary status.[62]

The KEA also argues that to grant the relief requested by plaintiffs and the KBE will be in violation of the Michigan Teachers' Tenure Act. M.C.L.A. § 38.71, *et seq.* But a state statute cannot be interposed as a defense when it will interfere with the attainment of constitutionally required goals. In such a case, the statute must be declared unconstitutional as applied.

The third and perhaps most potent argument by the KEA is that if Black teachers with low seniority are recalled this court will be discriminating against the Whites who have greater seniority. In addressing this claim, it is best to begin with the basic rule that a remedy for constitutional violations is intended to make the victim of unconstitutional conduct whole. *Milliken v. Bradley*, 433 U.S. 267, 280–281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). To achieve this, a court is empowered with broad and flexible equitable powers which permit it to make a " 'nice adjustment and reconciliation between the public interest and private needs as well as between com-

**61.** The KEA argues in its brief that:
> If an employer's seniority system is non–discriminatory, and its employees, such as those here, have not been the subject of discriminatory hiring practices, such a seniority system cannot be struck down by a court even if it perpetuates the effects of past discrimination.

This rule is similar to that which has been enunciated by several courts, *see, e. g., Acha v. Beame*, 531 F.2d 648 (2nd Cir. 1976); *Chance v. Board of Examiners & Board of Education*, 534 F.2d 993 (2nd Cir. 1976); *Watkins v. United Steel Workers*, 5 Cir., 516 F.2d 41 (1975); *Jersey Central Power & Light Co. v. Local Union 327*, 508 F.2d 687 (3rd Cir. 1975); *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir. 1974); *Schaefer v. Tannian*, 394 F.Supp. 1136 (E.D.Mich.1975), *remanded* 538 F.2d 1234 (6th Cir. 1976), most of which have held that only those employees who have actually been discriminated against may challenge the seniority provisions of the labor contract. There is, however, no indication that this rule is confined to situations involving employee discrimination. An employer's actions can also discriminate against nonemployees (*e. g.*, students), and they have just as much right to be made whole as do employees. To accomplish this, a court must be able to strike at those things which, if left untouched, would perpetuate the discrimination against these individuals, including a seniority system.

**62.** See discussion on pp. 743–745 and note 41.

peting private claims.' " *Swann v. Charlotte–Mecklenburg Board of Education, supra*, 402 U.S. at 15, 91 S.Ct. at 1276, *quoting Hecht Co. v. Bowles*, 321 U.S. 321, 329–330, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944).

█ In the instant case, this court must reconcile the interests which the students have in being made whole through the attainment of a 20% Black staff with the interests of White teachers who might be displaced by less senior Black teachers if the lay off and recall provisions of the contract are nullified. In determining what, if any, "nice adjustment" might be made to resolve this conflict, the court turns first to *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). There, the Supreme Court had to determine if a remedy under Title VII could grant the victims of hiring discrimination retroactive seniority from the date of their employment application. In approving such relief, the Court rejected arguments that this action would be improper because it would upset the expectations of other innocent employees who might lose some privileges if others were given greater seniority without having worked for it. The Court ruled that a "sharing of the burden of the past discrimination" is necessary if discrimination and its effects are ever to be remedied. *Id.*, at 777, 96 S.Ct. at 1270. The fact that this might upset employee expectations arising from the seniority system agreement did not deter the Court:

> ... it is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make–whole" objectives of Title VII. These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy.

\* \* \* \* \* \*

Accordingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected. "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed." *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2nd Cir. 1971).

*Id.*, at 774–775, 96 S.Ct. at 1269.

Just how much of the burden of past discrimination can be shared by innocent individuals was never articulated by the *Franks* Court; but at least one limit has been added by the Sixth Circuit. In *Detroit Police Officers' Association v. Young*, 608 F.2d 671, 696 (6th Cir. 1979), the court ruled that to make the victims of racial discrimination whole a remedy may prefer Blacks and burden innocent Whites so long as the remedy is "reasonable." This test of reasonableness requires that the preference be "substantially related to remediating the prior discrimination, but that it not "unnecessarily trammel" the interests of the Whites. *Id.* In making this determination, the district court must consider the urgency of effectuating its remedy, practical limitations in doing so, and the degree of hardship to be borne by Whites. *Id.* The court must also consider the Court of Appeals admonition that:

> ... concern for the interests of white employees cannot be allowed to thwart achievement of the state's goals. It is reasonable for some persons innocent of wrongdoing to bear some burden in order to correct the harsh effects of a grievous wrong of constitutional dismensions ....

*Id.*, at 696.

It is this court's opinion that this test of reasonableness must be used to review the present lay offs and the remedial action which has been proposed. This will require that a conscious assessment be made of what the costs to all parties will be for each proposed course of action. A remedial decree should be issued which attempts to

minimize these costs while granting plaintiffs the greatest relief possible.

Applying this reasonableness standard to the instant facts, this court concludes that to permit lay offs to proceed pursuant to the terms of the collective bargaining agreement would have a detrimental impact on the District's remediation of its past violations and would seriously affect its effort to achieve the 20% Black staff which is necessary for unitary status. The lay offs would reduce the District's minority staff from 12.6% to 9.8%, with the percentage of Black teachers falling from 11.1% to 8.9%.[63] This percentage of Black teachers would be equivalent to the percentage employed in 1973–74, the year of this court's permanent injunction. See, pp. 738–739, *supra*. This would be a damaging step backward, particularly for a District with a Black student population that has risen from almost 20% in 1973–74 to nearly 30% in 1980.

Dr. Townsend, the District's Superintendent, and Dr. Green highlighted the impact which this would have. Dr. Townsend stated that if the lay offs take place as scheduled it would be difficult to reach the 20% goal in the near future.[64] Dr. Green testified, as has been heretofore set forth, that the lay offs would take away badly needed student role models and would have a psychological impact on the students and the general community who could perceive the District's actions as being inequitable and a disavowal of its promises to desegregate.

All of this, of course, means that the implementation of this court's order will be delayed, but delay is something the Supreme Court, or this court, will not tolerate. A remedy must be designed "to work and work now;" it must dismantle the state-imposed dual system at the earliest possible date. *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). These goals cannot be achieved if contracts, or other matters, are allowed to interfere with the desegregation process.

The Constitution takes precedence over all, and to achieve its required goals, obstructions such as the collective bargaining agreement and state statutes have to give way.

On the other hand, plaintiffs' proposed remedy is not without its difficulties. The recall of all Black teachers would put the District closer to its goal of 20%, but it would also mean that all Black probationaries would have to be immediately recalled and put in place of more tenured White teachers. These are teachers who have given years of dedicated effort to the Kalamazoo public schools, and testimony indicated that each is sensitive to the needs of minority students and is committed to working with the school system to achieve the objectives of desegregation. From this they could develop legitimate expectations that they had some degree of job security. To now replace many of these teachers with probationaries who do not have the teaching experience and teaching ability of these more experienced teachers, would place these teachers under undue hardship.

An immediate return of all Black probationaries could also have a detrimental impact on the District's students. The Green–Cohen Report documents a sharp difference in basic skill achievement (*i. e.*, reading, language development, and mathematics) between minority and non–minority students. For example, in second grade the average minority student is one–half year behind the average non–minority student in both reading and mathematics; by ninth grade, this gap widens to two years for math and three years for reading.[65] This low achievement needs to be remedied, but this court is fearful that a sudden return of all Black probationary teachers would not accomplish this. Henry Goodman testified that a probationary teacher of any race is not the equal of a tenured teacher.[66] He stated that when a district is operating under an austerity budget, as Kalamazoo is,

---

**63.** KBE Ex. No. 10. See note 36, *supra*.

**64.** Testimony of Superintendent Charles Townsend, p. 485.

**65.** Green–Cohen Report, pp. 169–182.

**66.** Testimony of Henry Goodman, pp. 20–22.

then it is not in the best interests of the students to have a probationary teacher.[67] This is because class sizes will be larger and there will be fewer hall monitors to help with discipline. To manage this situation and still be an effective teacher, it is helpful to have teachers with experience.[68]

What is needed is a remedy that (1) facilitates the achievement of the 20% goal, (2) does not sacrifice anything in terms of educational quality, and (3) does not unnecessarily trammel the interests of experienced White teachers. To facilitate the achievement of the 20% goal will require that the lay offs provide the students with a sufficient number of role models. To not sacrifice anything in terms of educational quality will require that as many tenured Black and White teachers as possible be retained. To not unnecessarily trammel the interests of White tenured teachers will require that as few as possible of the most senior teachers be laid off and that those on lay off be able to return to teaching at the earliest possible date.

■ These three goals can be accomplished if the District first recalls all Black tenured teachers who are now on lay off.[69] This will provide the students with a sufficient number of role models, but because these teachers are tenured their return should not diminish in any way the quality of education delivered to all the students. At the same time, experienced White teachers will not have to bear an undue amount of hardship since only a few will be displaced to make room for returning Black teachers; [70] but as will be discussed below, they should be recalled quickly.

While this will raise the percentage of minority teachers above what it was last year, this court believes that a remedy must be designed to do more than just maintain pre-lay off ratios. This is because this level could be maintained for the whole time it takes to recall everyone, which in this case could be several years. The District's percentage of Black teachers has lingered too long on plateaus,[71] while its percentage of Black students has continued to increase. A remedy must be designed which insures that the District makes progress toward the court-ordered goal of 20%.

■ To insure that the KBE maintains an upward thrust towards this goal, this court holds that once the KBE has recalled all Black tenured teachers, then all future recalls are to be based on seniority, so long as at least 20% of all recalls in any one year are filled by Black employees.[72] Where a seniority based recall would result in the return of less than 20%, then Black teachers must be recalled out of order to the extent necessary to achieve this percentage. If the District should ever reach a point where the only teachers left in the recall pool are either non-Black or Blacks who are not certified for available jobs, then it must recall no more than 80% non-Black, while hiring so as to achieve 20% Black. After all laid off teachers have been recalled, the District is to hire new Black teachers at an annual rate of at least 20%, and this is to continue until its teaching staff rises to 20% Black.[73]

All of this will require that some Black teachers be recalled ahead of some more

67. *Id.*, p. 22.

68. *Id.*

69. These teachers are listed on KBE Ex. No. 9.

70. Because the District will use the $246,000 from the library budget for the recall of teachers, this will mean that fewer teachers will have to be displaced.

71. From 1974–75 through 1976–77, the District's percentage of minority staff hovered at approximately 10.5%, and from 1976–77 through 1979–80 it was almost 11.5%.

72. In determining if the 20% goal has been met for the present year, the Black tenureds are to be counted.

For purposes of recall only, the three Hispanic probationary teachers and the one Native American probationary teacher are to be recalled as if they were Black.

73. While this court's hiring order speaks only to Black teachers, it is expected that the District will continue its efforts to hire teachers of other races. In a school system like Kalamazoo's, which has a multi-cultural and multi-racial student body, it is important that all students have a sufficient number of role models. This is particularly true of races that have

seniored White teachers, and this should result in the District's percentage of minority staff rising to 13.5% in the present year and even higher in succeeding years. It will also mean that the lay off and recall provisions of the collective bargaining agreement will have to be nullified. This, however, is necessary because it will provide the students with an ever–increasing number of role models, while making it easier for the District to achieve its 20% goal. It will also prove to its Black students that Blacks are not always the ones who bear the brunt of lay offs during times of financial hardship.

This action will also result in the recall of many experienced teachers, while only gradually introducing probationaries into the system.[74] Thus the students will have a substantial number of experienced teachers, but they will also be assured that the percentage of Black role models will be maintained.

At the same time, experienced White teachers will not have to bear an undue amount of hardship. As was noted above, only a few will be displaced to make room for returning Black teachers, but since seniority is still a vital part of the recall process they should be returned to their jobs very quickly. As for the others remaining on lay off, they will have their recall delayed for only a short while longer than they might have expected. These effects are not so substantial as to amount to an unnecessary trammeling of these teachers' interests.

To further facilitate the District's efforts to achieve a 20% Black faculty, the Kalamazoo Board of Education is ordered to put in practice the measures recommended in the Green–Cohen Report concerning staff recruitment, selection, assignment, terminations and promotions.[75]

## IV. AFTERWARD

During the writing of this opinion, I had the occasion to visit a few of Kalamazoo's public schools so that I could judge first hand the progress that had been made to desegregate. While my visits only gave me a superficial look at the school system, they nonetheless were sufficient to leave me with several strong impressions, all of which reaffirmed my belief that desegregation can be accomplished peacefully and produce positive results. Most striking was the attitude I found among students, teachers, administrators, and board members, all of whom were proud of their schools and committed to making desegregation a success.

While the District has yet to complete the desegregation process, it has come a long way since those years before the commencement of desegregation when it was experiencing student unrest, caused in part by a lack of sensitivity toward minorities. This success is largely due to the dedication of parents, teachers, Board members, administrators, and the superintendent, Dr. Charles Townsend. They have literally turned this school system around and the community should be proud of their work.

I only wish that every citizen could view these schools as I did, and see the work that is being accomplished in every area, not just desegregation. It is work they would be proud of, and hopefully it would reaffirm their belief in the importance of education and further strengthen their commitment to support the schools.

---

historically been discriminated against throughout the country, such as Hispanics and Native Americans.

**74.** This opinion is not intended to in any way limit the Kalamazoo Board of Education's ability to grant or deny tenure to probationary teachers of any race; nor is it intended to limit the Board's ability to discipline or dismiss any

tenured or probationary teacher when deemed appropriate.

**75.** Green–Cohen Report, pp. 301–305. The KBE, however, is not to put into practice the Green–Cohen Report's recommendation on staff reductions, *id.*, p. 304. In this area, it is to be guided by this court's opinion.