George ARTHUR, et al., Plaintiffs,

v.

Ewald P. NYQUIST, et al., Defendants.

No. Civ–1972–325.

United States District Court,
W. D. New York.

Aug. 21, 1981.

Jay, Klaif & Morrison, Buffalo, N.Y. (David G. Jay, Buffalo, N.Y., of counsel), for plaintiffs.

Joseph P. McNamara, Corp. Counsel, Buffalo, N.Y. (Aubrey McCutcheon, Sp. Counsel, William E. Carey, Asst. Corp. Counsel, and James P. Caher, Deputy Corp. Counsel, Buffalo, N.Y., of counsel), for Mayor James D. Griffin, Superintendent of Schools Eugene T. Reville, The Board of Education, and the Common Council of the City of Buffalo, defendants.

James A. W. McLeod, Buffalo, N.Y., for plaintiff-intervenor Citizens for Quality Education.

Jaeckle, Fleischmann & Mugel, Buffalo, N.Y. (J. Edmund deCastro, Jr., Buffalo, N.Y., of counsel), for plaintiff-intervenor Puerto Rican Legal Defense and Education Fund.

Serotte, Harasym & Reich, Buffalo, N.Y. (Bruce A. Goldstein, Buffalo, N.Y., of counsel), for plaintiff-intervenor John Bushey.

Robert Clearfield, Buffalo, N.Y., for intervenor Buffalo Teachers Federation.

CURTIN, Chief Judge.

In April of 1976, this court held that the Buffalo Board of Education and the City of Buffalo were guilty of intentional racial segregation of the Buffalo Public School System [BPSS]. The court's findings of fact and conclusions of law are fully reported in *Arthur v. Nyquist,* 415 F.Supp. 904 (W.D.N.Y.1976), *aff'd* 573 F.2d 134 (2d Cir. 1978), *cert. denied Manch v. Arthur,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Numerous decisions have followed the original liability finding in an attempt to fashion a comprehensive and acceptable remedy. These decisions include my orders of March 26, 1979 and August 8, 1980, concerning staff hiring procedures adopted by the Board of Education subsequent to the liability decision.

The original decision contained a finding that non-white teachers, principals, and support staff were underrepresented in the BPSS and that the Board's failure to in-

crease the minority teaching percentage was an intentional act of discrimination. *Arthur v. Nyquist, supra* at 944–48. In each of my orders following this decision and at numerous meetings among the parties, the court has expressed its concern that the efforts of the Board to recruit and place minority teachers and staff personnel have been inadequate.

The history of the efforts made by the court and the parties to develop an affirmative action plan has been detailed in my prior orders. *See* orders of May 4, 1977, March 14, 1978, and February 23, 1979. The issue culminated finally in my order of March 26, 1979, which imposed a one-for-one hiring and recall goal upon the Board, to be continued until the ratio of minority to majority school personnel reflected the same ratio existing in the general community. The defendants were ordered to submit a plan which would comply with the following guidelines:

> [The defendants shall adopt] 21% as the long-term percentage goal for the hiring and promotion of minority administrators, professional staff, and other staff. This figure shall be revised, if necessary, when the results of the 1980 census have been tabulated.
>
> The defendants shall determine the minority percentage of their full and part-time staff for each job category (e. g., principals, elementary classroom teachers, and custodians) and identify each category in which the minority composition is less than 21%. In accordance with their proposal, the defendants shall hire and promote one minority for every non-minority in the identified job categories until the long-range goal has been achieved. The one-for-one interim goal shall also apply to the rehiring of provisional teachers and to the rehiring of non-tenured teachers who were laid off as a result of the budget cutbacks instituted in July, 1978. See the court's order of February 23, 1979.
>
> In meeting these goals, the defendants shall not be required to hire or promote any minority candidate who is not qualified for the position, as the job qualifica-

tions are currently defined by the Board. But defendants are directed to continue reviewing their selection criteria in order to minimize their impact on minority candidates (*see* Board's "Statement of Commitment," filed December 18, 1978) and to report to the court in writing on July 1, 1979 on their recommendations, if any, for changes in the selection criteria.

The Board and the plaintiffs jointly submitted a plan which complied with these guidelines. The plan was approved by the court as modified on August 8, 1980, and supplements my order of March 26, 1979. The Buffalo Teachers Federation [BTF] has noted some objections to the plan.

The motion currently before me concerns hiring and promotion practices adopted by the Board in August of 1979 and utilized during the 1979–80 school year. This motion was originally brought in New York State Supreme Court by the BTF in September of 1979. It was removed from the state court and consolidated with this case by order of the court. *Buffalo Teachers Federation v. Bd. of Ed. of City of Buffalo,* 477 F.Supp. 691 (W.D.N.Y.1979).

In its motion, the BTF claims that the Board of Education violated provisions of New York Education Law by its failure to appoint as probationary teachers certain qualified individuals who met the requirements for appointment and had been placed on the eligibility lists as mandated by state law. In addition, the BTF alleges that the Board of Education has breached the collective bargaining agreement existing between them by its actions regarding the hiring of temporary and probationary teachers and recall of teachers who had been excessed. According to the BTF, both tenured teachers and the individuals whose names were placed on the eligibility lists have vested rights under the *bona fide* seniority system established by the collective bargaining agreement, which rights have been violated by the Board.

After the case was removed to this court, the BTF continued to process the grievances of the individual teachers through the

grievance/arbitration procedures of the collective bargaining agreement. These grievances were ripe for arbitration by April of 1980. The Board requested a stay of the arbitration proceedings from this court. The BTF meanwhile moved for summary judgment on its complaint. The motion for summary judgment was denied. The Board's request for a stay of the arbitration proceedings was granted, but only temporarily. Because many issues regarding the proper construction of the collective bargaining agreement and state education law were presented, the court concluded that it would be advisable to have an arbitrator's interpretation of the contractual provisions relating to seniority, excessing of teachers and the applicable state education law relating, especially, to hiring of probationary and temporary teachers. Accordingly, the parties were directed to present their grievances before an arbitrator pursuant to the provisions of the collective bargaining agreement. The arbitrator was instructed to render his decision without regard to the March 26 order of this court. *Order* of August 8, 1980.

In compliance, a hearing was held on January 28, 1981, before Arbitrator Thomas N. Rinaldo. Both the Board and the BTF appeared at the hearing. Testimony was taken from Ms. Edith Levin, an Assistant to the President of the BTF, and Mr. Frank Aquila, a Uniserve Director of the BTF who testified concerning the traditional hiring practices of the Board of Education.

Arbitrator Rinaldo delineated the following questions as those presented by the parties for resolution:

(1) Must the Board of Education fill permanent vacancies with probationary appointments from teachers placed on eligibility lists?

(2) Where a permanent teaching vacancy exists, is the Board of Education required to make a probationary appointment?

(3) Must the Board of Education excess teachers in order of seniority from tenure areas?

(4) What rights does an excessed teacher have?

(5) Is the Board of Education required to fill temporary vacancies from eligibility lists?

After consideration of the applicable law, the Arbitrator rendered his decision regarding each issue. A summary of his findings follows:

The New York State Education Law clearly mandates Boards of Education in a City School District with the population of the City of Buffalo to fill permanent vacancies with probationary appointments from teachers placed on eligibility lists. In the case of layoffs, the Education Law has recognized seniority and mandates that the least senior teacher in his tenure area is to be the first to be excessed. Any excessed teacher is to be placed on a preferred eligibility list in order of seniority based on service in the system. Boards of Education cannot deviate from the above mandated provisions of the State Education Law. State courts have strictly construed the provisions of the Education Law and invalidated actions by Boards of Education which have attempted to circumvent the law.

In the case of temporary appointments, it is only necessary to look at Article XII(A) and (D) and the past practice of the parties to rule that the Board is required to fill temporary vacancies from eligibility lists and where eligibility lists have expired, temporary appointments must be made from experienced teachers who have satisfactory service with the Board.

The bottom line of the Arbitrator's decision is that "[a]ny hiring practices inconsistent with the above are either violative of the collective bargaining agreement or the New York State Education Law." The court accepts the Arbitrator's conclusions and his interpretation of the relevant law. Given that my order of March 26, as supplemented by the parties' plan, is at variance with the rules that generally govern, the question now before the court is what impact that order shall have upon state law and the collective bargaining agreement?

■ My prior decisions demonstrate that it has been the goal of the court as well as the parties to fashion a remedy which is comprehensive yet is "carefully tailored to the scope of the violation." Orders of February 23, 1979 and May 26, 1979; *and see Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). In any case involving violations of constitutional rights, the basic rule, which has been reiterated time and time again, is that the remedy for the violations must be designed to make whole the victims of the actions. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *Keyes v. School District No. 1,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). In formulating and effectuating such remedies, courts must be guided by traditional equitable principles. As has been stated by the United States Supreme Court,

> a school desegregation case does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right. The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.

*Swann, supra* at 15–16, 91 S.Ct. at 1275–76 (1971).

The court's order of March 26, 1979, was issued in response to the Board's hiring and assignment policies, to redress the constitutional violations flowing from these practices. From the time of the first decision and in subsequent meetings and orders, the court has emphasized that affirmative recruitment and utilization of minority personnel for administrative, instructional, and non-instructional positions are crucial elements of the remedy. The court recognizes that the primary responsibility for implementation of any school desegregation order rests with the local school board. *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [Brown II]. When it became obvious, however, that the Board had defaulted in its obligation to proffer an acceptable remedy, the court was nevertheless compelled to intervene with respect to faculty and staff appointments. *Swann v. Charlotte-Mecklenburg Board of Education, supra.*

■ The March 26 order was not decided with undue haste or without adequate preparation. It was the product of most careful consideration of all the evidence presented, of hearings held, and of numerous public and private meetings among the court and the parties. As a vital part of the remedy, the order, as supplemented by the plan, must be given effect. Applying basic principles of constitutional law, neither state law nor contract law may be used as a defense when the result would be to impede a court-ordered remedy for constitutional violations. *Martin v. Hunter's Lessee,* 1 Wheat. 304, 4 L.Ed. 97 (1816); *McCulloch v. Maryland,* 4 Wheat. 316, 4 L.Ed. 579 (1819); *Bradley v. Milliken, supra; Morgan v. Kerrigan,* 530 F.2d 431 (1st Cir.), *cert. denied sub nom. Doherty v. Morgan,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976); *United States v. Greenwood Municipal Separate School District,* 406 F.2d 1086 (5th Cir.), *cert. denied* 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969); *Oliver v. Kalamazoo Board of Education,* 498 F.Supp. 732 (W.D.Mich.1980). To the extent the provisions of the New York State Education Law and the collective bargaining agreement are in conflict with the provisions of the court's order, they may not be enforced but will be superseded by the order.

The position of the BTF is that the individual teachers have vested rights in their positions which cannot be denied to them. The BTF characterizes these individuals as "innocent bystanders" who cannot be "displaced because of the discriminatory conduct of an employer." Brief for BTF at 21. The BTF relies heavily upon the facts that neither the union nor its members were defendants in the original action and that there has been no finding of discriminatory conduct on the part of the BTF or its mem-

bers. The Union has cited to the court numerous decisions such as *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), which discuss the propriety of voluntary affirmative action programs and the validity of collective bargaining agreements. These cases, however, are not applicable to the instant motion. The court's examination of the BPSS's employment practices and the subsequent remedial orders were undertaken to protect the rights of the plaintiffs in this case: the minority school children and their parents. And, while it is a matter for serious concern and careful consideration, the expectations of majority teachers must not be allowed to interfere with the court-ordered remedy. *Bakke, supra* 438 U.S. at 300, 98 S.Ct. at 2753; *Oliver v. Kalamazoo, supra* at 752–55.

Thus, the provisions of the March 26 order and supplemental plan will remain in effect. The Board shall continue to adhere to its one-for-one hiring program, regardless of a minority applicant's placement on the eligible list, until the 21 percent goal established by the court has been met or surpassed for each job title within the system. The question remains, however, whether the Board may be liable to some individuals who were not appointed as probationary teachers for the school year 1979–80. The issue arises because the technique employed for hiring for that particular school year, called "block hiring," was ultimately rejected by the court as an effective tool for desegregation. *Order* of August 8, 1980.

The Board's policy of block hiring was devised during 1979. The Board claimed that, because it was unable to achieve the 21 percent goal in each instructional category, its plan was to hire additional minority staff in the pre-Kindergarten through Grade 6 classes, thus offsetting the lesser successes in other grades and achieving the overall hiring objective. The policy was communicated to BTF representatives at a meeting held on August 25, 1979. The representatives were informed that some probationary offers which had been issued to individuals on the eligible lists were being withdrawn and that no further probationary appointments would be made.

■ Block hiring was rejected by the court as an acceptable affirmative action plan because it presented the danger that the pre-Kindergarten through Grade 6 classes would contain the vast majority of minority teachers and would become racially identifiable while other job categories remained segregated. Despite its ultimate rejection by the court, the Board's implementation of the policy was undertaken in a good faith effort to comply with the provisions of the March 26 order. In August of 1979, when it undertook to implement the block hiring policy, the Board was faced with the dilemma of whether to hire teachers from the eligible lists, which would postpone or prevent attainment of the 21 percent hiring goal, or whether to act not in accordance with state law and contract law and hire away from the lists in favor of minority applicants. It was clear to the Board from earlier opinions that continued use of the lists would not be tolerated as an excuse for the Board's failure to recruit and place adequate numbers of minority staff. *Orders* of May 4, 1977, and March 26, 1979. While prior submission to the court of the Board's plan would have been preferable, the Board nevertheless acted within the spirit of the order, and the court finds that its actions were reasonably undertaken in compliance with the order. Accordingly, the Board is not liable to those individuals whose names were passed over on the eligibility lists and who were not hired.

A separate issue is presented by the Board's decision, communicated to the BTF representatives at the same meeting, to hire temporary teachers instead of probationary teachers where permanent vacancies existed. Arbitrator Rinaldo found that this practice was a violation of New York Education Law § 2573 (10–a) which states:

10–a. In a city having a population of four hundred thousand and less than one

million it shall be the duty of the superintendent of schools, at the direction of the board of education, to hold examinations whenever necessary, to examine all applicants who are required to have their names placed upon eligible lists for appointment in the schools of such cities and to prepare all necessary eligible lists. Eligible lists shall not be merged and one eligible list shall be exhausted before nominations are made from a list of subsequent date. No eligible list shall remain in force for a longer period than three years. Recommendations for appointment to the instructional service, except for the position of superintendent of schools, associate superintendent, assistant superintendent, director, supervisor, principal, head of department, executive assistant to the superintendent, or any other office or position of the rank of supervisor or above, shall be from the first three persons on an appropriate eligible list so prepared.

New York law is clear on the issue. Whenever a permanent teaching vacancy exists, probationary appointment must be made. Any other action, such as appointment of a per diem substitute or temporary appointment, has been characterized as an "unlawful attempt to evade the tenure law." *Serritella v. Board of Education of Westbury School District*, 396 N.Y.S.2d 57, 58, 58 A.D.2d 645 (2d Dept. 1977). This court's decisions, on the other hand, are silent on this issue. The March 26 order states only that whenever probationary positions are available, they must be filled on a one-for-one basis. The Board had no reasonable basis for concluding that it. was compelled by the court's order to hire only temporary instead of probationary teachers. Because the court's orders are not in contention with and not intended to supersede the state law, New York Education Law § 2573 (10–a) remained in effect and should have controlled the Board's actions.

Thus, the Board should have made probationary appointments to fill permanent vacancies. To the extent that the provisions of § 2573 (10–a) were violated by the Board,

the remedies provided for by state law are appropriate except that the Board shall not be responsible to any individual whose placement on the staff as a probationary teacher would have violated the one-for-one hiring order of March 26, 1979.

In summation, the court's order of March 26, 1979, will remain in effect, and the Board is directed to continue the policy of one-for-one hiring. The Board's actions in implementing its block hiring policy were justified under the circumstances and do not render the Board liable to individuals whose names were on the eligible list. Individuals who would have received probationary appointments consistently with § 2573 (10–a) and the provisions of the March 26 order but for the Board's actions are entitled to a remedy. Arbitrator Rinaldo has retained jurisdiction over the grievances which were the source of the arbitration case, and the case is hereby remanded to the Arbitrator for the formulation of an appropriate remedy.

So ordered.