Tallulah MORGAN, et al., Plaintiffs,
Appellees,

v.

John D. O'BRYANT, et al.,
Defendants, Appellees,

Local 66, Boston Teachers Union, AFT,
AFL–CIO, Intervenor, Appellant.

Tallulah MORGAN, et al., Plaintiffs,
Appellees,

v.

John D. O'BRYANT, et al.,
Defendants, Appellees,

Boston Association of School Administrators and Supervisors, Intervenor,
Appellant.

Tallulah MORGAN, et al., Plaintiffs,
Appellees,

v.

John D. O'BRYANT, et al.,
Defendants, Appellees,

Concerned Black Educators of Boston,
Intervenor, Appellant.

Nos. 81–1561, 81–1617 to 81–1619
and 81–1646.

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1982.

Decided Feb. 17, 1982.

Bruce A. Miller, Detroit, Mich., with whom Christopher P. Legghio, Stuart M. Israel, Miller, Cohen, Martens & Sugarman, P. C., Detroit, Mich., James T. Grady and Grady & McDonald, Boston, Mass., were on brief, for Local 66, Boston Teachers Union, AFT, AFL–CIO.

Paul F. Kelly, Boston, Mass., with whom Richard W. Coleman, and Segal, Roitman & Coleman, Boston, Mass., were on brief, for Boston Ass'n of School Adm'rs and Sup'rs, AFL–CIO.

Caroline B. Playter, Boston, Mass., with whom Doyle, Playter, Novick & Berkin,

Boston, Mass., and Kenneth Kimerling, New York City, were on brief, for El Comite De Padres.

Larry J. Johnson, with whom Robert Pressman, Cambridge, was on brief, for Tallulah Morgan, et al.

Marshall Simonds, Boston, Mass., with whom Henry C. Dinger, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for Boston School Committee.

Robert H. Blumenthal, Boston, Mass., Counsel, Dept. of Ed., with whom Robert H. Bohn, Jr., Sp. Asst. Atty. Gen., Boston, Mass., was on brief, for Bd. and Com'r of Ed.

John C. Somers, New York City, on brief for The A. Philip Randolph Institute, amicus curiae.

Nancy Gertner, Charles W. Rankin, and Silverglate & Gertner, Boston, Mass., on brief for Concerned Black Educators of Boston.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

These consolidated appeals are from orders of the district court in the Boston school desegregation case. A short history may prove helpful. In 1974, the district court found that Boston public school authorities had knowingly engaged in a policy of racial discrimination and intentionally maintained a dual school system along racially segregated lines. *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.1974). This court affirmed. *Morgan v. Kerrigan*, 509 F.2d 580 (1st Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The basic remedial orders were entered in 1975 and affirmed in 1976: *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass. 1975), *aff'd*, 530 F.2d 401 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976). In addition to holding that pupil assignment and other actions were discriminatory, the district court found that defendants discriminated in the area of faculty and staff hiring[1] and assignment. 379 F.Supp. at 456–66. Accordingly, the court ordered that black and white teachers be hired on a one-for-one basis until the percentage of black faculty reached 20 percent (the approximate percentage of blacks in Boston at that time),[2] with affirmative recruitment to continue until a figure of 25 percent black faculty was reached, *Morgan v. Kerrigan*, 388 F.Supp. 581 (D.Mass.1975), and this court affirmed, 530 F.2d 431 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976). An order to the same effect with respect to administrators was entered on February 24, 1976; this order was neither published nor appealed. In 1978, the district court found that the defendants had not complied with its faculty recruitment and hiring orders, and therefore modified those orders to require that the percentage of black teachers increase annually by at least one and one-half percentage points until the 20 percent goal was attained. This unpublished order was entered July 5, 1978 and was not appealed.

By early 1981, the percentage of black teachers was 19.09 percent and that of black administrators 20.53 percent. This progress was threatened, however, by a budget crisis precipitated by decreased funding. In order to comply with its reduced budget, the Boston School Committee considered massive layoffs of teachers and administrators. It was faced, however, with conflicting obligations: on the one hand, its collective bargaining agreements called for layoffs by reverse seniority; on the other, such a procedure would drastically reduce the percentage of black teachers and administrators (most of whom had been

1. In 1972–73, 5.4 percent of the permanent teachers were black; in 1970–71, 3.5 percent of the administrators were black. 379 F.Supp. at 463.

2. The percentage of black students in the Boston public schools at that time was approximately 35 percent. *Morgan v. Kerrigan*, 388 F.Supp. at 582. Preliminary 1980 census figures show an overall black population in Boston of over 22 percent; the projected percentage of black children in the Boston public schools for 1981 was over 46 percent.

hired in the last few years and thus had little seniority), in violation of the district court's desegregation orders. The School Committee decided that if layoffs of teachers proved to be necessary, they should be conducted so as to maintain the current percentage of black teachers, but layoffs of administrators, if necessary, should be conducted by reverse seniority. It filed motions with the district court for approval of these decisions. On June 2, 1981, the district court granted the motion—with minor modifications—with respect to the teachers.[3] On July 9, 1981, it denied the motion with respect to the administrators and ordered that the percentage of black administrators be maintained even in the face of layoffs.

The court's orders were conditional. That is, they did not themselves mandate any layoffs. Rather, they simply specified the principles determining who should be laid off if, for reason of economics or otherwise, layoffs were in fact made. Layoffs have since taken place in accordance with the priorities established in the court orders, thus maintaining the existing percentages of black faculty and administrators at close to 20 percent. The Boston Teachers Union ("BTU") asserts that between 700 and 1,100 teachers have been laid off. If the seniority approach had been followed, this would have reduced the percentage of black teachers to somewhere around 8 percent. Our information on the administrators from the Boston Association of School Administrators and Supervisors ("BASAS") is more precise: 15 headmasters and principals with permanent appointments were laid off. If seniority had been followed, 13.8 percent of those remaining would be black.

The appeals consolidated here for our review are as follows. In No. 81–1561, intervenor BTU appeals from the June 2 order and from the district court's denial of its request for reconsideration of that order on July 24, 1981. The plaintiff class, the School Committee, the State Board of Education, and intervenors El Comite de Padres Pro Defense de la Educacion Bilingue and Concerned Black Educators of Boston ("CBEB") have filed briefs as appellees; the A. Philip Randolph Institute has filed a brief as *amicus curiae* urging reversal. In No. 81–1617, intervenor BASAS appeals from the July 9 order. The appellees are the same as those in No. 81–1561, with the exception that the School Committee takes no position in this appeal. Finally, Nos. 81–1618, 81–1619, and 81–1646 are appeals brought by CBEB arguing that the orders do not go far enough in remedying past discrimination. No. 81–1618 is from the June 2 order; No. 81–1619 is from the denial of CBEB's motion to rescind that order; and No. 81–1646 is from the July 9 order.

The standards for equitable remedies in school desegregation cases have been set forth by the Supreme Court in *Milliken v. Bradley*, 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). As discussed *infra*, we believe that the district court committed no abuse of discretion under *Milliken*, and we therefore affirm its orders. We note additionally, however, that the procedural posture of this case also argues for an affirmance. BTU asserted virtually none of the arguments it now presents on appeal to the district court during the argument conducted below concerning the faculty order entered June 2. At that argument, it chiefly spoke against the need for any layoffs and also against proposals to tailor the layoff procedure so as actually to increase beyond present ratios the percentage of black faculty. As far as we can glean from the record, it did not argue that the Boston School Committee's proposed formula for laying off teachers—the formula largely adopted by the district court—would involve unconstitutional discrimination, nor did it make any request for an evidentiary hearing, until its motion for

---

**3.** The order also specifies that laid-off black teachers will have an absolute preference in recall until the 20 percent goal is reached. The order suspends the defendants' obligation to engage in affirmative recruitment aimed at reaching a goal of 25 percent black faculty, until all tenured teachers who are laid off have been recalled.

reconsideration filed almost seven weeks after the original order. The district court must have broad discretion in deciding such motions for reconsideration, especially where no reasons are advanced for the movant's failure to present its arguments earlier. *Cf. Willens v. University of Massachusetts*, 570 F.2d 403, 406 (1st Cir. 1978) (discretion to grant relief from judgment). Similarly, BASAS did not argue that the district court's maintenance approach was unconstitutional at the July 9 hearing on the motion with respect to the administrators. Finally, CBEB had filed no motions until after the June 2 order was entered; the district judge understandably expressed considerable doubt as to his ability to grant the relief CBEB requested in the absence of a prior motion. On appeal, the district court's exercise of its discretion is judged by the information and motions before it at the time it rendered its decision—not by hindsight. On this basis, it would be difficult—quite apart from our view of the substantive merits as discussed below—to overturn the lower court's handling of the various issues then before it.

The importance of this case, however, and its human impact, naturally make us hesitant to decide on procedural and technical grounds. We thus turn to the merits of the controversy. The first *Milliken* requirement is that, "like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. The remedy must therefore be related to 'the *condition* alleged to offend the constitution....'" *Milliken v. Bradley*, 433 U.S. at 280, 97 S.Ct. at 2757 (citations omitted; emphasis in original). It is plain that the present order, aimed at preserving a goal concerning the percentage of black teachers and administrators, is directly related to the unconstitutional conditions earlier found by the district court. This court has twice upheld the underlying district court orders concerning the percentage of black faculty as part of the desegregation remedy. *Morgan v. Ker-*

*rigan*, 509 F.2d 599 (1st Cir. 1975); 530 F.2d 431 (1st Cir. 1976). In 1975, we said that, having "found pervasive violations of the constitutional rights of black school children in the Boston schools," the district court had an "obligation ... to rectify those violations," and we concluded that orders related to the percentage of black faculty "are directed toward the objective of eradicating the segregated system that has prevailed in the Boston schools, and [are] clearly within [the district court's] power in the context of this case." 509 F.2d at 600–01. We further held in 1976 that the 20 percent goal was a valid part of the effort "to eliminate segregation and its effects 'root and branch,'" 530 F.2d at 432, *citing Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). The 20 percent formula is thus clearly a part of the remedy earlier approved in this case to rectify the unconstitutional conditions found to exist. The purpose of the orders under review is to safeguard the progress toward desegregating the faculty and administrative staff—and thus the progress toward dismantling the dual school system—already made.

■ Unlike BASAS, BTU never really argues otherwise. Rather, it asserts that desegregation has now been accomplished and that the district court's powers are therefore at an end. *See generally Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976); *Swann . v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This argument has no basis in the present record, however. We find no indication that BTU ever moved in the district court that the court should withdraw, nor has it requested a hearing for the purpose of introducing evidence in support of such a motion.[4] Absent proceedings and proof showing that Boston's dual school system has been abolished, the district court retained power to make orders

---

4. While BTU's motion for reconsideration included a request for an evidentiary hearing, *see infra* p. 29, that hearing was, as stated in the

motion, "for the purpose of fully reviewing the impact on all the parties of the Court's June 2 order."

premised on the unconstitutional conditions it found to exist.[5]

■ We turn next to the second *Milliken* requirement: "the decree must indeed be *remedial* in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" *Milliken v. Bradley*, 433 U.S. at 280, 97 S.Ct. at 2757 (citation omitted; emphasis in original). Appellants BTU and BASAS contend that the orders do not satisfy this requirement because they benefit black teachers and administrators who were never shown to be the victims of hiring discrimination. They cite cases such as *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), which they contend limit the award of retroactive seniority and like benefits to identifiable victims of hiring discrimination. The argument is that the district court's orders discriminate in employment and that they lack the proper factual predicate because no minority individuals have been identified as the victims of any discrimination.

A similar argument was made to this court when the 20 percent goal was first ordered, and we rejected it then, as we do now:

This argument fundamentally misapprehends the nature of this case. The plaintiffs are not the black teachers or would-be teachers who have been discriminated against because of their race. The district court's examination of the School Committee's . . . policies was undertaken to determine whether those policies violated the rights of black Boston public school children. It is the rights of those children that the order in issue is intended to protect.

*Morgan v. Kerrigan*, 530 F.2d at 432. *See also Morgan v. Kerrigan*, 509 F.2d at 600 n.3. It has been recognized from the beginning that the victims here are the black school children, not the possible hiring discriminatees. *See Morgan v. Hennigan*, 379 F.Supp. at 456. The orders are thus designed, insofar as possible, to make the school children whole. Proof of individual hiring discrimination is irrelevant. The employment cases cited by appellants are inapposite as to this issue. *See Arthur v. Nyquist*, 520 F.Supp. 961, 966 (W.D.N.Y.1981).

The plaintiff class has a right to an education in a school system free of racial discrimination in the employment of teachers and staff. *Morgan v. Hennigan*, 379 F.Supp. at 456, 463. The elimination of the vestiges of a segregated school system cannot be accomplished until the effects of past hiring discrimination have been eradicated. *See supra* p. 26. Such discrimination, if allowed to continue, may lead to difficulties in fully integrating the schools and in eliminating the maintenance of a dual school system. An integrated faculty and staff is also necessary to bring black students and parents fully into the school community and decisionmaking processes and to counteract their past isolation. A racially balanced faculty also provides black students with role models, which may be "important because they can encourage minority students to higher aspirations and at the same time work to dispel myths and stereotypes about their race." *Oliver v. Kalamazoo Board of Education*, 498 F.Supp. 732, 748 (W.D.Mich.1980), *appeal pending.* We thus conclude that the orders here are remedial: they are designed to make the children whole, to vindicate their rights,

---

**5.** The record before us amply supports a conclusion that the desegregation remedial goals have not been fully achieved. The 25 percent goal, which this court characterized as a "built-in terminus for court responsibility," *Morgan v. Kerrigan*, 530 F.2d at 434, is not even close to fulfillment. The 20 percent goal has been barely achieved with respect to the administrators and is close to achievement with respect to the teachers. This goal, however, was never intended to delimit the court's remedial powers, and, moreover, we noted that "time may indicate the goal to be too modest." *Id.* The plaintiff class has indicated below that it desires to increase the 20 percent figure to over 22 percent. The court stated that its rulings here under review were without prejudice to the proposals to increase the 20 percent goal.

and that is indeed their effect. Indeed, under the principle of the law of the case, such a conclusion is compelled by our past decisions in this case.

■ Appellants argue further that even if these orders are remedial, they constitute forbidden racial preferences. Once again, we have already rejected a similar argument with respect to the one-for-one hiring ratio, *Morgan v. Kerrigan*, 530 F.2d at 432 n.2, and we do so now with respect to the instant orders. Once there has been a finding of intentional racial discrimination, race-conscious remedies are a constitutionally valid means of ameliorating the effects of such discrimination. *See, e.g., Fullilove v. Klutznick*, 448 U.S. 448, 477–78, 100 S.Ct. 2758, 2774, 65 L.Ed.2d 902 (1980) (Burger, C. J., announcing the judgment of the Court); *id.*, at 517–19, 100 S.Ct. at 2794–2796 (Marshall, J., concurring in the judgment); *Regents of the University of California v. Bakke*, 438 U.S. 265, 305, 98 S.Ct. 2733, 2756, 57 L.Ed.2d 750 (1978) (Powell, J., announcing the judgment of the Court); *id.*, at 362–79, 98 S.Ct. at 2784–2793 (Brennan, White, Marshall, and Blackmun, JJ., concurring in the judgment in part and dissenting in part). Indeed, once a court has found racial discrimination in a school case, race-conscious remedies not only are permitted, they are said to be required where color-blind appoaches would be inadequate. *See, e.g., Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 28, 91 S.Ct. at 1282; *Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

There are, of course, limits to the use of race-conscious remedies, whether they be statutory or court-ordered. We have stated that

> racial criteria should be strictly scrutinized and given legal sanction only where a compelling need for remedial action can be shown.... [T]he means chosen to implement the compelling interest should be reasonably related to the desired end.

*Associated General Contractors of Massachusetts, Inc. v. Altshuler*, 490 F.2d 9, 17–18 (1st Cir. 1973), *cert. denied*, 416 U.S. 957, 94 S.Ct. 1971, 40 L.Ed.2d 307 (1974). The constitutional violations found in this case certainly, under the precedents cited *supra*, constitute the "compelling need" for a race-conscious remedy. Once this has been established, the proper test is essentially one of reasonableness. Other circuits are substantially in accord, stating, for example, that affirmative action plans may not "unnecessarily" "trammel" the interests or opportunities of whites. *See Valentine v. Smith*, 654 F.2d 503, 510 (8th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 972, 70 L.Ed.2d —— (1981); *Detroit Police Officers Association v. Young*, 608 F.2d 671, 696 (6th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1980); *United States v. City of Miami*, 614 F.2d 1322, 1339, *reh. en banc granted*, 625 F.2d 1310 (5th Cir. 1980); *see also United Steelworkers of America v. Weber*, 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979).

The orders here meet this test of reasonableness. They were necessary to safeguard the progress toward desegregation painstakingly achieved over the last seven years. Without them, the percentage of blacks would have fallen almost to its level nearly a decade ago, before this suit was brought. Such a result could not be countenanced. *See generally Green v. County School Board*, 391 U.S. at 438–39, 88 S.Ct. at 1694; *Morgan v. McDonough*, 540 F.2d 527, 533 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977). Nor was the position taken by the district court an extreme one: CBEB, for example, argues that it should have gone much further. The court postponed achievement of the 25 percent goal, rather than ordering a layoff procedure to meet that goal. It chose to forego using the layoffs as a means of achieving greater desegregation, in favor of simply ensuring that they did not threaten the progress already made.[6]

---

**6.** This discussion also serves to dispose of the issues raised by CBEB's appeals. CBEB essentially contends that the layoffs should not slow progress toward the 25 percent goal. We cannot say that the district court abused its discretion in entering the orders it did. The 25 per-

We thus conclude that the district court's orders were a reasonable response to the situation which confronted it, and that, in the circumstances, they do not constitute forbidden racial preferences. In what is to our knowledge the only other case dealing with this precise issue, a district court came to the same conclusion: a preference for black teachers in layoffs and recalls is a reasonable and constitutionally permissible solution to the problem. *See Oliver v. Kalamazoo Board of Education*, 498 F.Supp. 732, 750–55 (W.D.Mich.1980), *appeal pending*. We are not unmindful of the substantial human costs engendered by these layoffs, but those costs are, for the most part, the product of the layoffs themselves, and not of the court orders, which in themselves required no layoffs at all. We understand, and sincerely regret, the fact that the expectations of certain teachers have been defeated,[7] but the alternative would be to defeat the expectations of the plaintiff class of school children and their parents. The district court struck a reasonable balance between these competing interests, and we therefore see no reason to disturb it.

We turn, then, to the last prong of the *Milliken* test:

> [T]he federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution.... If, however, "school authorities fail in their affirmative obligations ... judicial authority may be invoked."

*Milliken v. Bradley*, 433 U.S. at 280–81, 97 S.Ct. at 2757 (citation omitted). This factor cuts in favor of the district court's decision with respect to the teachers, since the district court accepted (with only minor modifications) the Boston School Committee's

own proposal for dealing with the situation. This is not a case where a judicial formulation has been imposed upon a resistant and objecting local administrative body. The factor initially weighs against the order in the administrators' case, because the court refused to grant the School Committee's motion to conduct layoffs by seniority. For several reasons, however, this alone does not mandate reversal. First, the order is not particularly intrusive into local affairs; it simply mandates continued compliance with earlier orders, without becoming involved in such local matters as control of the budget, *see infra* p. 30. Second, the School Committee itself has taken no position in this appeal, so it is difficult to accept an argument premised on that body's interest in managing its own affairs. Indeed, the other local authority involved, the State Board of Education, has filed a brief in support of the order. Finally, as *Milliken* itself recognizes, even the interest of local authorities could not preclude a court from remedying constitutional violations. More intrusive measures have been authorized, where necessary, in other aspects of this case. *See Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976), *cert. denied*, 429 U.S. 1042, 97 S.Ct. 743, 50 L.Ed.2d 755 (1977) (South Boston High School receivership).

■ Appellant BTU raises one final argument, that the district court erred in failing to hold an evidentiary hearing before granting the School Committee's motion. We note at the outset that BTU never requested such a hearing until its motion for reconsideration, which by itself provides a strong reason for rejecting the argument, *see supra* pp. 25–26. In addition, the evidence that BTU wishes to present is, for the most part, either sufficiently known to the district court or irrele-

---

cent goal, while real, *see* note 5, *supra*, was not to be achieved by hiring preferences, but simply by affirmative recruitment. The proposed layoffs presented the court with difficult decisions involving competing interests. As discussed above, we think the orders entered were reasonable.

7. We do not accept appellants' argument that the collective bargaining seniority provisions

preclude the court from taking the action it did. In the first place, the contract with the teachers provides that the layoff and recall procedure shall be subject to all lawful federal orders. Second, the contracts alone cannot bar a federal court from granting effective relief for constitutional violations. *See Arthur v. Nyquist*, 520 F.Supp. at 965, and cases cited therein.

vant. The district court was apprised of the fundamental information it required for a decision: the impact that layoffs would have on compliance with court-ordered remedies. The court was certainly aware of the impact that layoffs would have on those laid off. The layoffs themselves were never ordered by the court, whose orders were conditional, *see supra* p. 25. Nor was the court obliged to consider budget reallocation as an alternative to the layoffs, since the School Committee's own motion kept it in substantial compliance with the court orders. Absent noncompliance, the court would have no justification to intrude upon local matters such as budget decisions. *Compare Oliver v. Kalamazoo Board of Education*, 498 F.Supp. at 746–50. We thus see no reversible error in the district court's denial of BTU's request for an evidentiary hearing in its motion for reconsideration.

*Affirmed.*