George ARTHUR, et al.,
Plaintiffs-Appellees,

and

Community Advisory Board for Bilingual
Education of Buffalo, et al.,
Plaintiffs-Intervenors-Appellees,

v.

Ewald P. NYQUIST, Individually and as
Commissioner of Education of the State
of New York, et al., Defendants-Appel-
lees,

Buffalo Teachers Federation, et al.,
Defendants-Appellants.

No. 962, Docket 82–7802.

United States Court of Appeals,
Second Circuit.

Argued April 6, 1983.
Decided July 22, 1983.

Robert D. Clearfield, Gen. Counsel, New York Educators Association, Albany, N.Y., for defendants-appellants.

Thomas I. Atkins, Gen. Counsel, NAACP, Brooklyn, N.Y. (David Gerald Jay, Buffalo, N.Y., on the brief), for plaintiffs-appellees.

J. Edmund DeCastro, Jr., Buffalo, N.Y. (Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., on the brief), for plaintiffs-intervenors-appellees.

Aubrey V. McCutcheon, Jr., Buffalo, N.Y. (James J. McLoughlin, Acting Corp. Counsel, William E. Carey, Asst. Corp. Counsel, Buffalo, N.Y., on the brief), for defendants-appellees.

Before KAUFMAN, TIMBERS and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal concerns primarily the degree to which a district court can impair the seniority rights of teachers in order to eliminate the vestiges of racial segregation within the faculty of a public school system and to vindicate the school children's right to a desegregated education. The Buffalo Teachers Federation (Federation) challenges a remedial plan adopted by the District Court for the Western District of New York (John T. Curtin, Chief Judge) for the Buffalo school system. See 520 F.Supp. 961 (W.D.N.Y.1981). As part of that plan, the Court approved an elaborate remedy designed to achieve a goal of twenty-one percent minority teachers in all teaching areas through a race-conscious system for hiring and laying off teachers. Although we find the District Court's plan to be basically sound, we conclude that in one respect the Court's remedy is unnecessarily harsh. We therefore affirm in part, reverse in part, and remand for the entry of a modified order.

I.

In April 1976, the District Court found the Buffalo Board of Education responsible for intentionally causing and maintaining a segregated school system. 415 F.Supp. 904 (W.D.N.Y.1976), aff'd in relevant part, 573 F.2d 134 (2d Cir.), cert. denied sub nom. Manch v. Arthur, 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978). Among the Board's discriminatory policies was a purposeful program "that has segregated, and was intended to segregate, the teacher and administrative staffs in the Buffalo public schools." Id. at 946. Between 1967 and 1973, minority employees had held roughly ten to twelve percent of all staff positions, even though the minority population of Buffalo was twenty-one percent, according to the 1970 Census. Id. at 943–46. Moreover, a disproportionate share of the minority staff was assigned to schools with predominantly minority student bodies. Id.

As an initial matter, the District Court left to the Board of Education the task of developing a plan for desegregating its teaching and administrative staffs, but after numerous meetings with the parties, the Court came to the conclusion that judicial prodding would be necessary. Accordingly, on March 26, 1979, the District Court issued an order setting general guidelines for desegregating the staff of the Buffalo school system. With this order, the Court made two basic decisions: first, that the percentage of minority teachers and administrators in every job classification should be the same twenty-one percent that minorities

represented in the community at large, and, second, that this twenty-one percent target should be achieved through "one-to-one" hiring, whereby the Board would have to hire one minority teacher for every majority teacher hired.

### A.

To appreciate the plan eventually devised to implement the District Court's order, as well as the Federation's objections to that plan, some understanding of New York law and the Federation's collective bargaining agreement is necessary. In the Buffalo school system, there are three types of teachers: tenured teachers, probationary teachers, and temporary teachers. Probationary and permanent teachers are on the "tenure track" of the system. When a tenured position becomes available, the Board must appoint a probationary teacher. N.Y. Educ.Law § 2573(1)(a) (McKinney 1981). If satisfied with the appointee's services after three years, the Board then makes the teacher a tenured and therefore permanent member of the faculty. *Id.* § 2573(1)(a), (5). Under New York law, probationary appointments in the Buffalo system must be made from an eligibility list containing the names of all qualified applicants for a particular tenure area who have passed an examination administered by the Board.[1] *Id.* § 2573(10–a); *see Serritella v. Board of Education,* 58 A.D.2d 645, 396 N.Y.S.2d 57 (2d Dep't 1977). Applicants are ranked on the eligibility lists according to their performance on the Board's examination, and the Board is supposed to offer probationary appointments to those at the top of the relevant lists.

Outside the tenure track, the Buffalo system has a considerable number of temporary teachers, who serve on a year-to-year basis without any guarantee of being rehired. Temporary teachers fill positions left vacant by permanent and probationary teachers on sabbaticals and sick leave. Many temporary teachers in the Buffalo

system have served for a number of years. Typically, these long-term "temporary" teachers have many qualifications for permanent positions, but either have not passed the Board's examination for permanent employment or have not placed high enough on the eligibility list to be offered probationary positions. In selecting temporary teachers for a new school year, the Board looks first to the current eligibility list for qualified candidates. However, if the eligibility lists are empty or if no one on the eligibility lists wishes to accept the temporary positions, then the Federation's collective bargaining agreement requires that the Board offer the positions to those who have held temporary appointments in the past. In this way, the perennial temporary teachers have a limited, but apparently valuable, form of job security.

Under New York law, if the Board of Education elects to reduce the number of tenured positions, it must lay off teachers according to seniority. N.Y.Educ.Law § 2585(3). For example, if the Board had to eliminate several full-time positions for mathematics teachers, it would first discontinue the most junior probationary teachers in that area and, when there were no more probationary incumbents, begin to lay off permanent teachers. Laid-off permanent and probationary teachers (known in the statutory jargon as "excessed" teachers) are placed on "preferred eligibility lists." When new full-time positions become available, the Board is supposed to reinstate excessed teachers from these preferred eligibility lists based on their seniority. *Id.* § 2585(4). Teachers on preferred eligibility lists also have a right of first refusal for any temporary teaching positions that become available.

Having no guarantee of reemployment from year to year, long-term temporary teachers are not directly affected by layoffs. However, these teachers are indirectly affected. Layoffs create preferred eligi-

---

1. There is some question whether section 2573(10–a) still applies to the Buffalo school system because the section is limited to municipalities with between 400,000 and 1,000,000 inhabitants. According to the 1970 Census, Buffalo fit within that category, but the 1980 Census found that Buffalo had a population of less than 400,000.

bility lists and prevent a decrease in the number of names on the regular eligibility lists because fewer probationary appointments are made. Since the Board must offer all temporary positions to qualified teachers on both of these lists before hiring anyone else, long-term temporary teachers are less likely to be rehired when the Board reduces the number of tenured faculty members.

### B.

The District Court's March 26, 1979, order mandating one-for-one hiring to reach a twenty-one percent minority target placed the Board in a dilemma. At least for the foreseeable future, the Board had no obvious means of obeying the order without violating the seniority system established by statute and collective bargaining agreement. Under that system, a large group of predominantly majority teachers was entitled to whatever new positions become available. In 1978, fiscal difficulties and a declining student population had forced the Board to eliminate many tenured positions. In 1979, these laid-off teachers, most of them majority members, filled the preferred eligibility lists. Further layoffs were expected in the near future. Moreover, the normal eligibility lists were also composed largely of majority applicants, who should under state law have the second chance at job opportunities (after those on the preferred eligibility lists). The paucity of minorities on the normal eligibility lists resulted in part, the District Court concluded, from the fact that minorities had been discouraged from seeking employment in the Buffalo school system because Buffalo was one of only two municipalities in the state to require applicants to pass a special examination after completing the normal certification process. *See* 415 F.Supp. at 947 & n. 42.

The Board's first opportunity to respond to the District Court's order came in August 1979 as the Board prepared for the 1979–1980 school year. Although the record is not clear in every particular, at that time the Board apparently took two steps to comply with the order in light of both the established seniority system and the perceived short-term unavailability of qualified minority applicants. First, the Board decided to engage in "block hiring," whereby the Board elected to hire as many minority teachers as possible in whichever job categories there were qualified minority applicants. Second, the Board decided to hire temporary rather than probationary teachers for certain tenure-track positions. The record does not explain why the Board took this action, but there may have been two explanations. First, the Board may have decided that it should not fill up tenure-track positions with majority candidates, but rather should appoint temporary teachers until qualified minorities could be found. The Board may also have concluded that it would be easier to meet the District Court's one-for-one hiring quota through temporary appointments, which carry less stringent qualifications than do tenured positions.

The Board's initial efforts at compliance brought the Federation into court. On September 5, 1979, the Federation filed suit in New York Supreme Court. The Federation alleged that the Board had violated New York law by failing to fill permanent teaching vacancies with probationary appointments from the top of the appropriate eligibility lists and that the Board had violated its collective bargaining agreement by failing to offer temporary positions to teachers on eligibility lists and teachers with experience in the Buffalo system. The Board successfully moved to have the Federation's case removed to federal court under 28 U.S.C. § 1443(2) (1976). The District Court subsequently consolidated that suit with the ongoing school desegregation litigation and joined the Federation as a defendant. *See* 477 F.Supp. 691 (W.D.N.Y.1979).

While the Federation's claims were before the District Court, the Board of Education and lawyers for the plaintiffs agreed upon a formal plan for implementing the Court's March 26, 1979, order. The District Court accepted this plan, with minor modifications, on August 8, 1980. At the same

time, the District Court rejected the Board's use of block hiring on the ground that the technique led to a disproportionate number of minority teachers in elementary schools, thereby "concentrat[ing] minority personnel in racially identifiable ... schools."[2] The District Court thus interpreted its March 26, 1979, order to require twenty-one percent minority representation in each tenure area.

The remedial plan, as adopted by the District Court, called upon the Board to create three applicant lists for every tenure area: a preferred eligibility list, consisting of excessed probationary and permanent teachers; a current eligibility list, containing candidates who have met all state requirements and have passed the special Buffalo examination; and a qualified applicant list, including candidates who have not passed the Buffalo examination but are otherwise qualified. Whenever any tenure-track position becomes available, the Board is first to determine whether it was a majority's or a minority's turn to be hired, according to the District Court's one-to-one formula. The Board should then scan the appropriate applicant lists for the highest ranking candidate. The Board should begin with the preferred eligibility list, then, if necessary, proceed to the current eligibility list, and finally look to the qualified applicant list. For those tenure areas in which no minorities appear on any of the three applicant lists, the Board is instructed not to make any probationary appointments so as not to violate the Court's one-to-one hir-

ing requirements. In such cases, the Board was directed to make temporary appointments.[3]

The remedial plan called for temporary appointments to be made in a similar fashion. First, the Board was to determine whether the appointment goes to a majority or a minority applicant. Then the Board looks down the three applicant lists for a suitable candidate. If no name appears on these lists, the Board can appoint a candidate with an appropriate degree and eight credit hours in an approved teacher program, or, if nobody is available with those qualifications, a candidate with an appropriate degree.

Layoff procedures were also included in the remedial plan. Apparently, during the 1978–1979 cutbacks, the Board had excessed tenure-track teachers based on seniority and had thereby significantly reduced the ratio of minority teachers in the system. To avoid the same result in future layoffs, the plan called for force reductions based on existing minority/majority percentages in each tenure area. Before eliminating any positions, the Board must calculate the minority percentage holding probationary positions in the affected tenure areas as well as the minority percentage holding permanent positions. As long as these percentages fall beneath the twenty-one percent target, layoffs should be made, first from probationary positions and then from permanent positions, so as to maintain the then current percentages of minority staffing.[4]

---

2. The District Court subsequently ruled that majority teachers injured by block hiring were not entitled to relief through normal grievance procedures because the Board developed the technique in good faith compliance with the District Court's March 26, 1979, order. *See* 520 F.Supp. at 966. The Federation now contends that the Board's good faith should not prevent injured teachers from receiving back pay and lost seniority rights. In light of the complexity of this case and the District Court's familiarity with the Board's efforts, we conclude that it was within the Court's discretion to insulate the Board from liability for block hiring.

3. The plan allows the Board to make probationary appointments in violation of the one-to-one

formula if the Board can "factually demonstrate the unavailability" of qualified minority candidates. To our knowledge, the Board has not taken advantage of this provision.

4. For example, assume that the Board has to eliminate ten permanent positions for high school math teacher and that there were at the time fifteen probationary teachers in this category, three minority and twelve majority. Since minorities constitute twenty percent of these probationary positions, only two of the ten firings could be minorities. Consequently, even if the minority teachers had the least seniority in the area, one minority would remain and more senior majority teachers would be laid off. If the Board had to make another five layoffs in the same area, the remaining five

. In subsequent proceedings, the Federation challenged various aspects of the remedial plan. Ultimately, its entire challenge to the plan, which had formed the basis of the removed state court proceeding, was dismissed in a judgment entered September 29, 1982. The Federation appeals from that judgment, effectively bringing before this Court its basic objections to the remedial plan.

### C.

The District Court's remedial plan affects the contractual and statutory rights of the Federation's majority members in numerous ways. First, the plan denies some long-term "temporary" teachers their contractual right to be offered yearly appointments on the basis of their years of experience within the school system. Second, the plan abridges the rights of applicants on the current eligibility lists by limiting the number of available probationary positions and yearly temporary positions to which they have statutory and contractual claims. Finally and most seriously, the plan undercuts the job security of majority probationary and permanent teachers. Under the plan, these tenure-track teachers were more likely to be laid off during force reductions because the plan overrode the "last-in, first-out" seniority system created by statute. In addition, once a majority tenure-track teacher is laid off, the plan makes it more difficult for that teacher to be rehired. Under statute and contract, excessed teachers on preferred eligibility lists are entitled to whatever temporary or tenure-track positions become available based on seniority. Under the plan, however, all appointments to temporary and permanent positions are to be made under the one-to-one formula. Consequently, under the plan, an excessed tenured majority member of the faculty, already laid off in contravention of seniority, might be denied reemployment in favor of a minority applicant with no experience.

### II.

During the liability portion of this case, the District Court found that the Board of Education had consistently hired a disproportionately small percentage of minority staff members, and had intentionally assigned these minorities to schools with large minority student bodies. *See* 415 F.Supp. at 943–48. Such discriminatory policies are important indicia of a segregated school system, *see Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 435, 88 S.Ct. 1689, 1692, 20 L.Ed.2d 716 (1968), and the Supreme Court has repeatedly encouraged district courts presiding over school desegregation cases to remedy the effects of these practices. *See Milliken v. Bradley,* 433 U.S. 267, 281–83, 97 S.Ct. 2749, 2757–59, 53 L.Ed.2d 745 (1977) (*Milliken II*); *Davis v. Board of School Commissioners,* 402 U.S. 33, 35, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971); *United States v. Montgomery Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). The question raised by this appeal is whether the District Court exceeded its equitable powers by the means chosen to desegregate the faculty of the Buffalo school system.

The Federation argues that the District Court's remedial plan is invalid simply because it infringes upon statutory and contractual rights of majority teachers who played no role in the Board's past practices of segregation. We reject this argument. In *Milliken v. Bradley,* 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (*Milliken I*), the Supreme Court ruled that state laws cannot stand in the way of full remedies for constitutional violations. Here, the fact that the Federation has a seniority system should not be allowed to prevent or inordinately delay the achievement of a fully desegregated school system for the children of Buffalo.

---

probationary teachers, including the one remaining minority teacher, would lose their jobs. That one minority probationary teacher

would be laid off before any of the permanent teachers' jobs were put in jeopardy.

■ Nor was the District Court's authority impaired, as the Federation contends, by the Supreme Court's decisions in *American Tobacco Co. v. Patterson*, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), and *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In those Title VII cases, the Supreme Court ruled that bona fide seniority systems must be honored unless there has been a finding of actual intent to discriminate. *See* Civil Rights Act of 1964 § 703(h), 42 U.S.C. § 2000e–2(h) (1976). Here, however, the suit was brought to remedy violations of the Constitution rather than Title VII, and the District Court made a finding of intentional discrimination in the Board's maintenance of a segregated school system.[5] We therefore agree with the District Court that it had the authority to curtail the seniority rights of the Federation's membership in order to vindicate the constitutional rights of the minority children in the Buffalo school system. *See* 520 F.Supp. at 965–66; *accord Morgan v. O'Bryant*, 671 F.2d 23 (1st Cir.), *cert. denied*, — U.S. —, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982); *cf. Oliver v. Kalamazoo Board of Education*, 706 F.2d 757 (6th Cir.1983) (acknowledging power to make such an order, but reversing District Court's particular order). Once a local board of education has been found to have employed staff hiring practices that contribute to a racially segregated school system, the District Court has the power to remedy those practices and to override seniority systems that perpetuate those practices.

■ However, a district court should not exercise this power excessively. It must balance "individual and collective interests." *See Swann v. Charlotte-Mecklenburg Board of Education, supra*, 402 U.S. at 15–16, 91 S.Ct. at 1275–76. Moreover, "a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'" *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976) (quoting *Milliken I, supra*, 418 U.S. at 744, 94 S.Ct. at 3127). In particular, when a district court is shaping relief that will infringe upon seniority rights, the court must take care that the relief is necessary to correct constitutional violations. *See Oliver v. Kalamazoo Board of Education, supra*, 706 F.2d at 763.

■ Applying these standards, we find the District Court's remedial plan to be largely acceptable. Certainly the District Court's imposition of "one-to-one" hiring goals was permissible. The Court set these goals only after the Board failed to increase significantly the number of minority teachers in the system. Indisputably, these goals have the effect of delaying the appointment of some majority candidates on the eligibility lists and preventing certain long-term "temporary" teachers from being rehired. But the District Court was aware of these effects, and nevertheless concluded that the plaintiffs' interests in having a fully desegregated faculty in the foreseeable future justified the hardship to the teachers. We agree with the District Court that the expectations of the temporary teachers and the candidates on the eligibility lists were not so strong as to preclude the use of "one-to-one" hiring.

Similarly, it was not beyond the District Court's discretion to instruct the Board of Education to delay making probationary appointments in those areas in which insufficient numbers of qualified minority candidates were available to achieve "one-to-one" hiring. To allow otherwise would permit the current shortage of minority candidates to be reflected in the system's tenured faculty for years to come. There is some risk that the Board, preferring to appoint temporary teachers, might try to take advantage of this provision of the

---

5. Similarly, this Court's decision in *Chance v. Board of Examiners*, 534 F.2d 993 (2d Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), is inapplicable because that case, brought under 42 U.S.C. § 1981 (1976), involved a layoff remedy adopted solely in the context of employment discrimination. *Chance* was therefore analogous to a Title VII suit and not a school desegregation case.

plan, but the District Court has offered the Federation adequate protection against this possibility. The Board is obliged to undertake extensive recruiting efforts to find minority candidates and members of the Federation may take their cases to arbitration if they feel that the Board has taken advantage of the District Court's order to avoid making probationary appointments, see 520 F.Supp. at 967.

■ A closer question is raised by the District Court's decision to order that future layoffs be made on a percentage basis to guarantee maintenance of the existing ratio of minority to majority teachers. Strong interests lie on both sides. Probationary and permanent teachers have a statutorily established expectation that layoffs will be based on seniority. However, the effect of such layoffs would constitute a serious setback for desegregation of the school system. Between 1976 and 1981, the percentage of minority teachers in the Buffalo system increased from eight percent to fourteen percent. Seniority based layoffs would erode much of this progress and put the system even further away from the District Court's twenty-one percent target.[6] Faced with this conflict, the District Court concluded that percentage layoffs presented an equitable solution. Although some majority teachers who would otherwise have retained their jobs might be fired under the Court's plan, minority teachers would also bear some burden during cutbacks, and no tenured faculty members—either majority or minority—would be released until all probationary employees in the particular area were fired. In this way, the children in the school district would enjoy the bene-

fits of a significantly, if not wholly, integrated faculty.[7]

Considering the intractability of the problem before the District Court, we find its use of percentage layoffs acceptable. We agree with the First Circuit that percentage layoffs present a permissible means of achieving constitutionally mandated objectives despite contractually or statutorily established seniority systems during periods of staff reduction. See Morgan v. O'Bryant, supra. Although we sympathize with the individual teachers who suffered because of percentage layoffs, theirs is a burden that must be borne if we are to "eliminate root and branch" the segregated school system that once existed in Buffalo. Green v. County School Board, supra, 391 U.S. at 438, 88 S.Ct. at 1694.

■ The District Court's plan, however, does seem needlessly harsh in its treatment of laid-off probationary and permanent teachers. Under statute and collective bargaining agreement, these excessed teachers should be placed on preferred eligibility lists and given first chance, according to their seniority, at whatever temporary or permanent positions become available. However, under the District Court's scheme, these excessed teachers would be entitled to these positions only within the constraints of the Court's "one-to-one" hiring goals. While we can appreciate the District Court's desire to continue to make progress toward the twenty-one percent target even while majority excessed teachers remain on the preferred eligibility lists, we nevertheless find this aspect of the remedial plan unjustified.

Although the District Court found the lack of minority teachers to be a serious

---

6. The District Court's twenty-one percent target is not challenged on this appeal, and we therefore do not rule on its validity. We note, however, that other jurisdictions have been unwilling to approve teacher quotas based on the percentage of minority students in a school district or on minority population in a municipality. See, e.g., Oliver v. Kalamazoo Board of Education, supra.

7. In accepting percentage layoffs, the District Court rejected more radical proposals that

would have allowed the Board to progress toward the twenty-one percent targets despite on-going layoffs. Other jurisdictions have experimented with such remedies. See, e.g., Oliver v. Kalamazoo Board of Education, 498 F.Supp. 732, 754 (W.D.Mich.1980), rev'd, 706 F.2d 757 (6th Cir.1983); cf. Morgan v. O'Bryant, supra, 671 F.2d at 25 n. 3 (laid-off minority teachers given absolute preference in rehiring until targets met).

problem deserving a prompt remedy, the Court did not determine that relief could or should be instantaneous. For example, there is no reason to think that, in the absence of layoffs, the District Court would have ordered the Board to fire tenured majority teachers and replace them with minority candidates. We do not believe that the Court was justified in using firings precipitated by fiscal crises to achieve the same result. Without an explicit finding of demonstrable necessity, the District Court should not have impaired the rehiring rights of excessed probationary and tenured teachers.

On remand, the District Court should modify its remedial plan along the following lines. Layoffs may still be conducted on a percentage basis for each tenure area, but the laid-off teachers should be placed on preferred eligibility lists as they are laid off. Excessed teachers on preferred eligibility lists should then enjoy the same rights to new temporary and permanent positions that they are guaranteed by statute and collective bargaining agreement. This modification should eventually establish percentage rehiring equivalent to the percentage layoffs established in the District Court's plan, although majority excessed teachers with more seniority than minority excessed teachers will more quickly be rehired. We trust that the parties will assist the District Court in making these modifications.

The judgment of the District Court is affirmed in part and reversed in part; the matter is remanded for the entry of a modified order.